**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| FARYION EDWARD WARDRIP, | § | |
|     PETITIONER, | § | |
| | § | |
| V. | § | |
| | § | No. 7:01-CV-0247-G |
| NATHANIEL QUARTERMAN, | § | |
| DIRECTOR, TEXAS DEPARTMENT | § | |
| OF CRIMINAL JUSTICE, | § | |
| CORRECTIONAL INSTITUTIONS | § | |
| DIVISION, | § | |
|     RESPONDENT. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

This cause of action was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636 (b), implemented by an order of the United States District Court for the Northern District of Texas. The Findings, Conclusions, and Recommendation of the United States Magistrate Judge follow:

**FINDINGS AND CONCLUSIONS**

**I.      NATURE OF THE CASE**

A state prison inmate has filed a petition for writ of habeas corpus pursuant to Title 28, United States Code, Section 2254.

**II.     PARTIES**

Petitioner, Faryion Edward Wardrip , is an inmate in the custody of the Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ-CID). Respondent is the Director of TDCJ-CID.

## III.    PROCEDURAL HISTORY

After Petitioner pled guilty to capital murder, a jury heard evidence from the prosecution and defense regarding punishment and assessed Petitioner's punishment at death by lethal injection. *State v. Wardrip*, No. F-99-0988-E (367th District Court of Denton County, Tex. Nov. 5, 1999).[1] The case was appealed to the Texas Court of Criminal Appeals, and the Court of Criminal Appeals affirmed the death sentence in a published opinion. *Wardrip v. State*, 56 S.W.3d 588 (Tex. Crim. App. 2001). Petitioner filed a state application for writ of habeas corpus on October 26, 2000. The Court of Criminal Appeals denied relief in an unpublished order based on the trial court's findings and its own review. *Ex parte Wardrip*, No. 49,657-01 (Tex. Crim. App. November 14, 2001).

Petitioner filed an initial federal petition for writ of habeas corpus on December 31, 2002. Respondent filed an answer on April 23, 2003, and furnished the state court records. Petitioner filed a reply on September 23, 2003. This Court granted Petitioner's request for an evidentiary hearing and conducted hearings on October 11, 2006, and November 1, 2006. Petitioner filed a post-hearing brief on January 10, 2007, and Respondent filed a post-hearing brief on February 7, 2007.

## IV.    RULE 5 STATEMENT

Respondent states that Petitioner has failed to exhaust state court remedies with respect to his first and eighth grounds for relief. Respondent asserts that Petitioner did not address these claims either on direct appeal or in his state writ of habeas corpus and that they are therefore procedurally barred. Furthermore, Respondent also contends that Petitioner's other six claims were not exhausted at the state level because Petitioner has presented a substantial amount of evidence

---

[1] Petitioner was indicted and convicted of committing capital murder in Wichita County, Texas, but his case was tried in Denton County, Texas, pursuant to a motion for change of venue filed by the defense and granted by the trial court. (Transcript at 107).

to this Court that was never presented at the state court level. Nonetheless, Respondent asserts that, in the alternative, all of Petitioner's claims should also be denied on their merits pursuant to 28 U.S.C. § 2254(b)(2).[2]

**V.  ISSUES**

A.  Petitioner's Sixth Amendment rights were violated because his trial attorney provided ineffective assistance of counsel in the following seven respects:

1.  Trial counsel failed to conduct an adequate pre-trial investigation (ground one);

2.  Trial counsel failed to place into evidence Petitioner's prison record as mitigating evidence (ground two);

3.  Trial counsel failed to present evidence that Petitioner had undergone a "complete transformation" in the fourteen years since he committed the murders (ground three);

4.  Trial counsel failed to place into evidence any psychiatric testimony (ground four);

5.  Trial counsel continuously emphasized the prosecution's case when questioning potential jurors during voir dire (ground five);

6.  Trial counsel continuously raised the issue of parole when questioning jurors during voir dire (ground six);

7.  Trial counsel made only a perfunctory closing statement at the conclusion of the trial (ground seven).

B.  The cumulative effect of trial errors undermines confidence in the jury's verdict (ground eight).

This Court held evidentiary hearings on Petitioner's second, third, and fourth grounds for relief.

---

[2]  An application for a writ of habeas corpus may be denied on its merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State. 28 U.S.C. § 2254(b)(2).

## VI.    STANDARD OF REVIEW

The pertinent terms of the Antiterrorism and Effective Death Penalty Act of 1996 (the AEDPA), 28 U.S.C. § 2254, provide:

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding.

28 U.S.C. § 2254(d) (2006).

Section 2254(d)(1) concerns pure questions of law as well as mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001). Under the "contrary to" clause, a federal habeas court may grant the writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). With respect to the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. Under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal precedent from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495 (5th Cir. 2000).  Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000) (as modified on denial of rehearing).  The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

This statute applies to all federal habeas corpus petitions which, as with the instant case, were filed after April 24, 1996, provided that they were adjudicated on the merits in state court. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  Resolution on the merits in the habeas corpus context is a term of art that refers to the state court's disposition of the case on substantive rather than procedural grounds. *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997).

## VII.    FACTUAL BACKGROUND

The Texas Court of Criminal Appeals recited the following factual background in its opinion on direct appeal:

> Appellant pleaded guilty to the capital murder of Terry Sims.  The State presented evidence of the offense during the punishment phase of the trial.  Leza Boone, Sims' friend and co-worker, testified that she and Sims finished working their shifts at Bethania Hospital in Wichita Falls at approximately 11:15 p.m. on the night of December 20, 1984.  They planned to exchange Christmas gifts at the home of a friend after work and Sims was to stay at Boone's residence that night to help her study for her final exam the following day.  Boone was unexpectedly called to return to the hospital to work the next shift, so she drove Sims to Boone's residence after the Christmas gift exchange.  She dropped Sims off at approximately 12:30 a.m. on December 21, 1984.

> Boone finished her shift at the hospital at approximately 7:15 a.m. and returned to her residence.  Sims did not answer the door, so Boone obtained a key from her landlord who lived two doors down.  Boone opened the door and noticed that the

living room was in disarray. Sims did not respond when Boone yelled her name, so Boone ran back to her landlord's residence and told him that something was wrong. The landlord then entered Boone's residence and discovered Sims' dead body.

Sims was found lying naked on her left side in a pool of blood on the bathroom floor. Her hands were bound tightly behind her back with part of an extension cord that was tied in four knots. Her body was covered in blood and there was blood splattered on the bathroom walls and floor. The living room and front bedroom were in disarray. There were blood stains on the bed sheets and the floor in the front bedroom. Sims' bloodstained clothes were on the floor in the living room and the front bedroom.

Dr. Allen Stilwell, the forensic pathologist who performed the autopsy on Sims' body, testified that she had eight stab wounds on the right side of her back, one stab wound on her left upper arm, and defensive cuts on her hands and fingers. Stilwell believed that Sims sustained most of these stab wounds after her assailant tied her hands behind her back. Sims also had bruises on the bridge of her nose, her lips, and above the left side of her cheek and eye. Stilwell testified that these bruises were consistent with Sims being struck by a fist or by her falling and banging her head on the floor. He further testified that Sims had additional "tease wounds" which her inflicted by her assailant "to get her attention." He testified that at least one of Sims' stab wounds caused hemorrhaging when it punctured a major artery and that other stab wounds caused her lungs to collapse which prevented her from breathing. He determined that Sims probably died from these injuries within two to four minutes after they were inflicted.

The forensic test results showed the presence of sperm on the oral and vaginal swabs taken from Sims' body. The DNA testing of appellant's blood and saliva samples revealed that appellant was the only individual who could have contributed the sperm found on Sims' oral swab. In addition, appellant's fingerprints matched a bloody fingerprint found on Sims' tennis shoe.

Appellant gave a statement after his arrest. In his statement, he claimed that he was under the influence of "heavy drugs" on the night he murdered Sims. He stated that he was out walking when he saw Sims. He forced his way into the residence and "just ransacked her, just slung her all over the house in a violent rage." He remembered "stripping her down out of anger," tying her hands behind her back, and stabbing her with a knife, but he did not recall having sex with her. He could not remember if he brought the knife with him or what he did with the knife after he committed the murder. Appellant stated that he was "mad at the world" and that his drinking and drug abuse caused him to be paranoid and to have violent outbursts. He had the urge to "lash out" at two or three people that evening, but he acted on his urge when he encountered Sims.

The State introduced evidence that appellant murdered four more women in the two years following the murder of Terry Sims. Appellant's second victim was Toni Gibbs. On February 15, 1985, utility workers found Gibbs' nude body in a field in Archer County, a short distance from the Wichita County line. Gibbs had three stab wounds on her back, three stab wounds on her chest, and two defensive wounds on her left forearm and thumb. DNA testing revealed that appellant's blood and saliva samples matched the sperm found on the vaginal smear taken from Gibbs' body.

Appellant admitted to the murder of Gibbs in his statement. He encountered Gibbs at about six o'clock in the morning, after he had been out walking all night. He knew Gibbs because she was a nurse at the hospital where he worked as a janitor. Gibbs offered him a ride and he "started seeing images of hatred and anger" after he got in her car. He began "slinging" her around in the car and screaming at her and forced her to drive down a dirt road to a field. He admitted that he removed Gibbs' clothing and stabbed her, but he could not remember if he had sex with her. He left the scene in Gibbs' car and abandoned it on a street off the side of the freeway.

Appellant's third victim was Debra Taylor, whose body was found in a field in Fort Worth on March 29, 1985. Taylor sustained blunt-force injuries to her head and face and her death was caused by manual strangulation. The medical examiner was unable to determine whether or not Taylor had been sexually assaulted. Appellant admitted in his statement that he strangled Taylor to death behind a Fort Worth nightclub and disposed of her body in the field.

Ellen Blau was appellant's fourth victim. A county road crew employee found Blau's body in a field in Wichita County on October 10, 1985. The state of decomposition was such that the doctor who performed the autopsy could only conclude that the cause of death was "undetermined homicidal violence." Appellant admitted in his statement that he abducted Blau from a parking lot and forced her to drive down a dirt road. He took her to a field and stripped off her clothes, but did not recall if he raped her. He did not remember how she died, but stated: "She probably broke her neck because I was slinging her." Afterward, he drove back into town and abandoned her car.

Appellant's fifth victim was Tina Kimbrew, whose body was found on the floor of her ransacked apartment in Wichita Falls on May 6, 1986. Kimbrew had numerous bruises on her face, neck, and legs. Her nightgown was pulled up above her waist and her underwear was on the floor near her body; however, there was no evidence of recent sexual activity. The doctor who performed the autopsy concluded that Kimbrew was smothered to death. Appellant confessed to the murder of Kimbrew shortly thereafter. He pleaded guilty to murder and was sentenced to thirty-five years in prison. He was released on parole in 1997.

The State introduced a penitentiary packet showing appellant's 1986 conviction and thirty-five year sentence for the murder of Tina Kimbrew. Appellant's prison disciplinary records contained in his penitentiary packet showed that he was disciplined in prison for creating a disturbance and fighting without a weapon. The State introduced additional evidence that appellant dropped out of school in the twelfth grade and that he was discharged from the Army National Guard after a period of six years due to his conduct and willful absences.

*Wardrip v. State*, 56 S.W.3d at 3-6 (footnotes omitted).

## VIII. PROCEDURAL ISSUES

### A. Exhaustion

Respondent first asserts that Petitioner is procedurally barred from raising all of his grounds for relief. Specifically, Respondent contends that Petitioner's claims were not exhausted at the state level because he failed to raise either his first or his eighth grounds at the state level at all and because his remaining six grounds for relief, although raised at the state level, are based in large part on evidence never presented to the state courts.

A review of the records in this case reveals that Petitioner did not raise his first or eighth grounds for relief on either direct appeal or at the state habeas level. Petitioner did, however, raise his second through seventh grounds for relief at the state habeas level. Petitioner's claims when raised at the state level did not, however, have the evidentiary support submitted to this Court. At the state court level, Petitioner submitted as evidence affidavits from Larry Ravell and Ken Bishop, two gentleman who knew Petitioner when he was on parole. (State Habeas Transcript at 34, 35). Additionally, an affidavit from Petitioner's trial counsel, John Curry, was provided with the state's response and is part of the state habeas record. (SHTr.:46-56). In addition to these affidavits, however, Petitioner has also submitted to this Court several additional exhibits in support of his claims, including: 1) Wichita County and Denton County jail records; 2) an affidavit from Petitioner;

3) various notes and letters from Petitioner's trial counsel; and 4) additional affidavits from individuals who knew Petitioner during the time he was paroled, as well as from a psychologist, a private investigator, one of Petitioner's sisters, Petitioner's former sister-in-law, and Petitioner's state habeas counsel. (Petitioner's Record Excerpts). And, pursuant to the evidentiary hearings held in this case, this Court has accepted further exhibits from Petitioner, including additional affidavits from people who knew him after he was paroled from prison and John Curry's trial file. (*Joint Advisory Regarding Exhibits and Stipulation of Parties*, dated 1/4/07).[3] Moreover, in the two days of hearings held in this case, this Court heard testimony from Petitioner's trial counsel, John Curry, as well as a psychologist and psychiatrist hired by Curry to assist him in his defense of Petitioner.

Respondent contends that Petitioner has failed to exhaust his state court remedies with respect to his second through seventh grounds for relief because this additional evidentiary support was not submitted at the state court level. As support for this position, Respondent cites to *Graham v. Johnson*, 94 F.3d 958, 968 (5th Cir. 1996), in which the Fifth Circuit held that a habeas petitioner has failed to exhaust his state court remedies if he presents "material additional evidentiary support" for his claims to the federal court. In his reply, Petitioner asserts that these claims are not unexhausted claims, citing to *Anderson v. Johnson*, 338 F.3d 382 (5th Cir. 2003). In *Anderson*, the Fifth Circuit held that Anderson had exhausted his ineffective assistance of counsel claims because, although the claims were in a comparatively stronger evidentiary posture than they were in state court because of the additional affidavit submitted at the federal level, Anderson's brief at the state court level was both factually and legally detailed regarding the information that was contained in

_____

[3] This Court has also accepted exhibits from Respondent filed in response to Petitioner's claims. (Joint Advisory, dated 1/4/07).

the affidavit, Anderson was diligent and consistent in arguing his claim, Anderson did not deliberately withhold essential facts from the state court, and if the state court had held an evidentiary hearing as requested by Anderson, the exculpatory evidence contained in the affidavit would have most likely come to light. *Id*. at 388-89. Thus, the court in *Anderson* held that the new evidence "supplemented" and did not "fundamentally alter" the claim presented to the state court. *Id*. at 386-87.

The Fifth Circuit has more recently re-addressed the issue of whether a claim is exhausted if additional evidence is presented to the federal court that was not presented to the state court, resulting in a factually stronger habeas claim in federal court. In *Morris v. Dretke*, 413 F.3d 484 (5th Cir. 2005), the Fifth Circuit addressed a situation where a petitioner had raised a claim based on *Atkins v. Virginia*, 536 U.S. 304 (2002), in both the state and federal courts. At the state level, Morris filed a subsequent habeas application based on *Atkins*, and presented as evidence supporting his mental retardation claim his school records, affidavits from family members and friends, notes from the mental health expert appointed at trial, and an affidavit from a psychologist stating that, based on these records, he believed that there were indications that Morris had mental retardation and should be evaluated. The Court of Criminal Appeals dismissed the application as an abuse of the writ. *Morris*, 413 F.3d at 487-88. Morris submitted the same information to the federal district court and, after his motion requesting expert and investigative assistance was granted, also submitted an affidavit from another psychologist who had recently tested Morris's I.Q. and level of adaptive functioning, as well as an affidavit from another mental health expert who reviewed the results of the testing. Both diagnosed Morris as being mentally retarded. *Id*. at 489. The federal district court

dismissed the petition for failure to exhaust, based on the fact that this additional evidence was not presented to the state court. *Id.* at 490.

The Fifth Circuit ruled that Morris had not failed to exhaust his claims because, like in *Anderson*, his additional IQ evidence bolstered, but did not fundamentally alter his claim. In reaching this decision, the Fifth Circuit noted that: Morris' *Atkins* claim was detailed in fact and law when presented at the state level; he had consistently asserted that he is mentally retarded and that, given the resources, tests would confirm this; and Morris did not deliberately withhold facts from the state court in an attempt to expedite federal review. *Morris*, slip op. at 495-96. The Court further noted that the circumstances in *Morris* differed from those in *Graham* because Graham presented a substantial amount of new evidence that had not been even abstractly presented to the state court and Graham's actual innocence and ineffective assistance of counsel claims had not yet been addressed by the state court and therefore could have been raised in a subsequent writ. *Morris*, slip op. at 496-97.

Admittedly, this case differs from *Morris* because Petitioner did not submit to the state court numerous documents supporting his claims of ineffective assistance of counsel. However, the instant case differs also from *Graham* because Petitioner did raise six of his eight claims for relief at the state level. Moreover, three of the six claims that were raised both at the state level and here as his fifth through seventh grounds for relief, alleging that Petitioner's trial counsel was ineffective during the voir dire process and in his closing argument at trial, do not appear to rely on the new evidence submitted to this Court. And, with regard to Petitioner's fourth ground, in which he alleges that his trial counsel was ineffective for failing to present psychiatric evidence at trial, Petitioner's state habeas counsel did request, and was denied, funds with which to hire a psychiatrist to examine

Petitioner in order to present evidence to support this claim and was denied his request for an evidentiary hearing. (SHTr.:84-6, 88-91). Furthermore, federal habeas counsel has presented an affidavit from Petitioner's state habeas counsel in which he states that he knew about other evidence submitted to this Court, including evidence of Petitioner's good behavior in prison, and he attempted to develop this evidence at the state level, but was denied funds with which to hire an investigator. (Petitioner's Record Exhibit #30). Accordingly, the record reflects that Petitioner did attempt to obtain evidence to support his second, third, and fourth claim at the state habeas level. And finally, while Petitioner does present additional evidence to this Court to support these grounds for relief that was not placed into evidence and was not referred to at the state level, this Court finds that this additional evidentiary support for these claims supplements Petitioner's claims and does not fundamentally alter them. Accordingly, this Court finds that Petitioner's second through seventh ground for relief are exhausted claims.

With regard to Petitioner's first and eighth grounds for relief, which were not raised at the state court level at all, procedural default occurs when a petitioner fails to exhaust all available state remedies *and* the state court to which he would be required to petition would now find that the claim is procedurally defaulted. *Bledsoe v. Johnson*, 188 F.3d 250, 254 (5th Cir. 1999). And indeed, were Petitioner's unexhausted claims now brought in a subsequent state writ of habeas corpus, the Court of Criminal Appeals would consider these claims to be procedurally defaulted under Article 11.071 § 5 of the Texas Code of Criminal Procedure, which prohibits a claim from being raised in a subsequent habeas application unless: 1) it could not have been raised in the previous application because the factual or legal basis was unavailable at the time; or 2) the claim contains sufficient facts establishing that, but for a violation of the United States Constitution, no rational juror would have

found petitioner guilty or would have answered the punishment issues in the State's favor. *See* TEX.
CODE CRIM. PROC. ANN. art 11.071 § 5(a) (Vernon Supp. 1999). The legal and factual claims
presented in the grounds for relief that Petitioner failed to raise at the state level appear to have been
available to him at the time he filed his state habeas application, and Petitioner does not argue
otherwise. And, Petitioner has made no attempt to allege, much less prove, that his unexhausted
claims contain sufficient facts establishing that, but for a federal constitutional violation, *no* rational
juror would have sentenced him to death.

Nevertheless, under 28 U.S.C. § 2254(b)(2), a federal petition for a writ of habeas corpus
may be denied on its merits, notwithstanding the petitioner's failure to exhaust state court remedies.
*See* 28 U.S.C. § 2254(b)(2). Accordingly, as this Court has determined that Petitioner is not entitled
to relief on these two unexhausted claims, this Court will address the unexhausted claims on their
merits.

**B.        Right to Evidentiary Hearing**

Respondent has also asserted, at oral arguments conducted by this Court on May 31, 2006,
and at the beginning of the evidentiary hearings held in this case, that Petitioner was not entitled to
an evidentiary hearing in this Court because he failed to exercise due diligence to discover the
factual predicate for his ineffective assistance of counsel claims. (*See* 10/11/06 Evidentiary Hearing,
page 3). Under 28 U.S.C. § 2254(e)(2), if a habeas petitioner has failed to develop the factual basis
of a claim in state court, the district court shall not hold an evidentiary hearing on the claim unless
the petitioner shows that the claim either relies on a new rule of constitutional law made retroactive
or a factual predicate that could not have been previously discovered through the exercise of due
diligence *and* the facts underlying the claim would be sufficient to establish by clear and convincing

evidence that, but for constitutional error, no reasonable factfinder would have found the petitioner guilty. *See* 28 U.S.C. § 2254(e)(2).

In *Michael Williams v. Taylor*, 529 U.S. 420, 432 (2000), the Supreme Court held that, under 28 U.S.C. § 2254(e)(2), a habeas petitioner has not failed to develop the factual basis of a claim in state court unless there has been a lack of diligence, or some greater fault, on the part of the petitioner or petitioner's counsel. The Court further stated that such diligence depends upon whether the petitioner made a reasonable attempt to investigate and pursue claims in state court. *Id.* at 435. Diligence will therefore require that a petitioner, at a minimum, seek an evidentiary hearing in state court and that the petitioner be diligent in developing the record and presenting, if possible, all claims of constitutional error. *Id.* at 437. As the Fifth Circuit has noted, the Supreme Court's holding in *Williams* means that, if a petitioner develops the factual basis of a claim in state court, or sufficiently *attempts* to do so, § 2254(e)(2) does not bar an evidentiary hearing in district court. *Guidry v. Dretke*, 397 F.3d 306, 323 (5th Cir. 2005), *cert. denied*, 547 U.S. 1035 (2006).

In the case at hand, Petitioner's state habeas counsel requested an evidentiary hearing in state court to develop claims of ineffective assistance of counsel, but this request was denied. (SHTr.:84-6). And, state habeas counsel also requested, and was denied, funds to hire an investigator to further investigate claims and funds to hire a psychologist to examine Petitioner and further develop the claim that counsel was ineffective for failing to present mental health expert testimony. (SHTr.:88-9, 91). State habeas counsel also submitted several exhibits in support of the claims raised. Accordingly, because state counsel requested an evidentiary hearing in state court and sufficiently attempted to develop the factual bases for the claims through other means, § 2254(e)(2) does not bar an evidentiary hearing in this Court. Therefore, this Court granted Petitioner's request for a hearing

in part, holding limited evidentiary hearings regarding Petitioner's second, third, and fourth claims of ineffective assistance of counsel, as these claims were exhausted claims that are non-record based claims, for which additional information needed to be developed.

## IX.     EXAMINATION OF THE GROUNDS FOR RELIEF

## A.     Ineffective Assistance of Counsel Claims

In his first through seventh grounds for relief, Petitioner argues that his rights under the Sixth Amendment were violated because his trial counsel provided ineffective assistance of counsel. In particular, Petitioner complains of his attorney's representation with regard to pre-trial investigation, voir dire, the presentation of evidence, and the closing statement given at trial.

The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal case reasonably effective assistance of counsel. *Cuyler v. Sullivan,* 446 U.S. 335, 344-45 (1980). In order to obtain federal habeas relief due to ineffective assistance of counsel, a petitioner must satisfy the two-prong test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the *Strickland* test, in order to prove that his counsel was ineffective, a defendant must prove by a preponderance of the evidence both that counsel's performance was deficient and that this deficient performance prejudiced his defense. *Id*. at 687. Courts, however, should "indulge a strong presumption" that counsel's conduct falls within the range of reasonable assistance, and a defendant must overcome the presumption that an action is sound trial strategy. *Id.* at 689. To establish prejudice, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. In the context of ineffective assistance of trial counsel, the prejudice component of the *Strickland* test

"focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000) (citations and internal quotation marks omitted). Reviewing courts must consider the totality of the evidence before the finder of fact in assessing whether the result would likely have been different absent the alleged errors of counsel. *Strickland*, 466 U.S. at 695-96. The Court also noted in *Strickland* that a fair assessment of an attorney's performance requires one "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.

1.      **Pre-trial Investigation and Presentation of Mitigating Evidence**

In his first claim for relief, Petitioner claims that his trial counsel was ineffective for failing to conduct a complete pre-trial investigation. In his second, third, and fourth claims for relief, Petitioner asserts that his trial counsel was ineffective for failing to present sufficient mitigating evidence at the punishment phase of the trial. Specifically, Petitioner asserts that his attorney should have investigated and presented evidence of his excellent prison record while he was previously in prison for murder, evidence that Petitioner had undergone a "complete transformation" in the intervening years since he committed the murders, and should have presented testimony from a mental health expert.

Recently, in *Wiggins v. Smith*, 539 U.S. 510 (2003), and *Rompilla v. Beard,* 545 U.S. 374 (2005)*,* the Supreme Court applied the *Strickland* standard in cases where the claim was made that counsel was ineffective by failing to investigate, and then present, potentially mitigating evidence. The Court in *Wiggins* determined that the appropriate question was whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was a

reasonable decision. *Id.* at 522-23. Under the *Strickland* standard, a determination must be made regarding whether trial counsel used "reasonable professional judgment" to support a limited investigation into potential mitigation evidence. *Id.* This analysis is done by conducting an objective review of counsel's performance under the prevailing professional norms, in the context of counsel's perspective at the time of trial. *Id*. In *Wiggins*, the Court determined that trial counsel were ineffective for failing to investigate potential mitigating evidence beyond a series of tests conducted on Wiggins by a psychologist, a written pre-sentence investigation report, and records from the Department of Social Services (DSS). *Id*. at 523-24. Furthermore, the Court held that Wiggins had been prejudiced by this failure because, had counsel had a social history report prepared and/or followed up on the information contained in the DSS records, counsel would have uncovered and been able to present evidence that Wiggins suffered from severe deprivation and abuse at the hands of an alcoholic mother and physical and sexual abuse during subsequent foster care, and there was a reasonable probability that the jury, confronted with this evidence, would have returned a different verdict at sentencing. *Id.* at 524-25, 534-36.

Then, in *Rompilla*, the Supreme Court held that trial counsel were ineffective for failing to examine the court's file about a prior conviction Rompilla received for rape and assault in order to prepare to represent Rompilla at the sentencing phase of his capital murder trial, as defense counsel was on notice that the State intended to present evidence of this prior conviction in its attempt to seek the death penalty against Rompilla. 545 U.S. at 383. The Supreme Court then held that, had counsel viewed this court file, counsel would have discovered "mitigation leads" from the prison files, which indicated that Rompilla's history was very different from what Rompilla and his family had told trial counsel, including evidence of a childhood in a slum environment, a history of alcohol

abuse, and previous psychological tests that pointed to schizophrenia and other disorders, as well as a low level of cognition. *Id*. at 390-91. Then, had counsel pursued these leads, counsel would have discovered that Rompilla's parents were severe alcoholics, their children were neglected, Rompilla was frequently physically abused by his father, and Rompilla suffered from organic brain damage and significantly impaired cognitive function. *Id*. at 391-92. The Court concluded that Rompilla was prejudiced by this failure because there was a reasonable probability that he would not have been sentenced to death had the jury heard this evidence. *Id*. at 393.

### a. Pre-trial investigation

In his first ground for relief, Petitioner asserts that his trial counsel, public defender John Curry, was ineffective for failing to conduct sufficient pre-trial investigation.[4] Specifically, Petitioner alleges that Curry was ineffective because: 1) he did not begin his investigation in the case until two months before jury selection began; 2) he made no attempt to investigate the State's scientific evidence in an attempt to rebut this evidence; 3) he made only a minimal effort to obtain the services of a mitigation expert; 4) he opted not to contest pre-trial issues such as the potential disqualification of the trial judge; and 5) he did not contact Petitioner's friends and family to ascertain if they could testify at trial.

With regard to Petitioner's contention that his attorney made only a minimal effort to obtain a mitigation expert and his assertion that Curry did not contact his family and friends to testify, these claims will be addressed along with Petitioner's third ground for relief, in which Petitioner asserts

---

[4] An assistant public defender, Dorie Glickman, assisted Curry and sat second chair at the trial. But, as she has submitted an affidavit stating that her role was a secondary role in the case, and the parties do not dispute this characterization of her role, this Court will examine Curry's behavior alone in assessing Petitioner's claims of ineffective assistance of counsel. (Pet. Rec. Ex. #12).

that his attorney was ineffective for failing to present evidence of his "complete transformation" in the years since his prior imprisonment.

Regarding Petitioner's other claims, he presents no evidence to support his claim that his attorney did not begin his work on the case until two months before jury selection.[5] Without any evidence to support this claim, this Court will not find it to be meritorious. Contrary to another of Petitioner's claims, his attorney contested several issues during the pre-trial process. He did file a motion to disqualify and an amended motion to disqualify the trial judge, Judge Brotherton, because Brotherton had represented Petitioner's ex-wife during their divorce and had represented Danny Laughlin, a person who had previously been charged and tried for one of the murders Petitioner subsequently confessed to. (Tr.:62-63, 70-72). A hearing was held on this motion on August 2, 1999, Judge Brotherton was called as witness and questioned by defense counsel, and his testimony was that he had no contact with Petitioner during the divorce proceedings, that there were no allegations against Petitioner because it was a no-fault divorce, and that the case he represented Laughlin in, although it was a potential re-trial of the murder case, was ultimately dismissed, and Brotherton made only one court appearance in the case. (R. 3:4-9). The sitting judge denied defense counsel's motion, and Petitioner has presented no evidence that this was an incorrect ruling. (R. 3:13; Tr.:73).

---

[5] Petitioner has submitted the visitor's log from the Wichita County jail as an exhibit that reflects visits from Curry beginning in February 1999. The record of the trial reflects that pre-trial conferences began in April 1999, continued in August 1999, and jury selection began on September 30, 1999. (R. 1:1-2; Petitioner's Exhibit #1). Moreover, while the evidentiary hearings in this case did not involve this particular claim of ineffective assistance of counsel, at the hearing John Curry disputed the contention that he did no work on Petitioner's case until two months before jury selection. While Petitioner may be dissatisfied with the amount and type of work Curry performed after being assigned to the case, this does not support a broad claim that he performed no work on the case for six months.

Moreover, John Curry also filed a motion to change venue, which was granted, and motions to suppress the statements confessing to the murders made by Petitioner and to suppress blood, pubic hair, finger prints, and palm prints obtained from Petitioner. These motions to suppress were denied after evidentiary hearings were held on August 27 and 30, 1999. (Tr.:53-57, 64-68, 105, 107; R. 5, R. 6). In addition, although the State maintained an open file policy with regard to Petitioner's case (Tr.:4), defense counsel filed various motions for discovery, including motions for the State to produce evidence favorable to Petitioner, witnesses' statements, any material tangible evidence, and evidence of any arrests or convictions of State's witnesses, and for the State to reveal any agreements with witnesses and to give notice of any punishment evidence it intended to introduce. (Tr.:7-13, 17-23, 31-32, 34-35, 39-50). Thus, the record reflects that defense counsel contested numerous issues during the pre-trial process.

And, with regard to Petitioner's claim that his trial attorney was ineffective for making no attempt to investigate the State's scientific evidence in an attempt to rebut this evidence, the record reflects that Curry filed a motion to inspect, examine, and test physical evidence, which was granted by the trial court. (Tr.:26-28). But, given that the trial court ruled that the police did not violate Petitioner's fourth amendment rights when it obtained DNA evidence from him and ruled that his confessions to all five murders were admissible, and given that Petitioner *has never contested his guilt in any of the five murders*, Petitioner has failed to show any reasonable probability that, had counsel contested the DNA evidence to any greater degree, Petitioner would have opted not to plead guilty, would have been found not guilty by a jury, or would not have been sentenced to death.

In summary, Petitioner has failed to present evidence that his trial attorney provided ineffective assistance of counsel during the pre-trial investigation stage. Petitioner's first ground for relief is without merit, and it is recommended that it be denied.

**b.     Petitioner's prison record**

In his second ground for relief, Petitioner contends that his trial counsel was ineffective for failing to present evidence of his prior prison record as mitigating evidence at punishment. As noted earlier, Petitioner confessed to the murder of Tina Kimbrew, his fifth victim, shortly after he murdered her. He served eleven years of a thirty-five year sentence in prison for that murder before being paroled in 1997. It was after he was paroled that authorities tied him to two of the other murders based on DNA evidence and Petitioner's fingerprint on the shoe of one of the victims. When questioned by the authorities, Petitioner eventually confessed to four murders in addition to Kimbrew's murder. (R. 26:10-22, 32-40, 48-57, 68-72, 84-110). Petitioner asserts that his trial counsel should have presented evidence from his eleven year confinement, such as the fact that he took classes while in prison, wrote articles for a prison newspaper, and was involved in a fund-raiser for the medical needs of a local young man. (Pet. Record Ex. #20, 21, 28).

The state habeas court found that trial counsel was aware of Petitioner's good prison record and made a strategic decision regarding both what evidence to present and not to present and made a tactical decision to rely on the State's evidence to show Petitioner's prison record. The state habeas court further found that evidence of Petitioner's prison record was before the jury. (SHTr.:135, finding #19-22). The state habeas court then concluded that trial counsel was not ineffective for presenting further evidence of Petitioner's good prison record because trial counsel chose the legitimate trial strategy of utilizing the State's evidence rather than independently

introducing evidence. The court further concluded that Petitioner had failed to establish a reasonable probability that he would not have received the death penalty had counsel introduced into evidence additional evidence of Petitioner's good prison record. (SHTr.:155-56, #13, 16).

## Applicable Facts

### *Testimony at Evidentiary Hearing*

John Curry testified at the evidentiary hearing held by this Court.[6] At this hearing, he testified that, in September 1999, the State provided him Petitioner's educational records, his prison records, and some hospital treatment records, but it was his recollection that he had some of these records before that time. (10/11 EH:59). He further testified that Petitioner had informed him that he had had only one minor disciplinary infraction while he was in prison for the murder of Tina Kimbrew. (10/11 EH:61). Curry did not, however, attempt to contact any witnesses from the prison system who might be able to testify about Petitioner's time in prison. (10/11 EH:118-19, 122). He testified at the hearing that he did not recall why he did not attempt to discover or interview any witnesses with regard to Petitioner's life in prison and did not recall making a conscious decision either to pursue or not to pursue this type of evidence. (10/11 EH:119-20, 122).

Curry further testified that he was concerned that the State would play the tapes from the mediation sessions between Petitioner and Tina Kimbrew's parents while Petitioner was still in prison, in which he misrepresented his past behavior, as evidence that Petitioner's behavior had not

---

[6] Petitioner asks this Court to find John Curry's testimony from the evidentiary hearing not credible testimony. Petitioner's primary complaint about his testimony, however, is that he was unable to recall many things. While this Court will not base any finding or conclusion on a fact or issue about which Mr. Curry has no recollection, the Court declines to find that the specific testimony he did give at the hearing was not credible.

changed while he was in prison because he lied when asked direct questions. (10/11 EH:239-40).[7] Curry also testified that he was concerned that, because Petitioner was previously sentenced to thirty-five years and was paroled after eleven years, the jury would believe that he could be paroled again. He was also concerned that the jury might believe that Petitioner manipulated the system in order to be paroled. So, he instead argued that Petitioner knew how to do time in prison and would not be a threat to anyone. (10/11 EH:277-78).

*Evidence Presented at Trial*

At trial, Petitioner's penitentiary packet was admitted by the State at trial in its case in chief. (R. 26:146-47). This pen pack included two disciplinary actions taken against Petitioner when he was incarcerated for the murder of Tina Kimbrew, one for arguing with another inmate in a loud voice and another for fighting with and pushing another inmate for changing the channel on the television. (State Trial Ex. #142). On rebuttal, the State presented testimony from Tina Kimbrew's parents that they participated in mediation sessions with Petitioner in an attempt to forgive him for murdering their daughter. In these sessions, Petitioner told both of them that he had never harmed anyone other than Tina. (R. 27:32-3, 37-8). The videotapes of these sessions were not admitted into evidence.

Curry did not call any witnesses who could testify about Petitioner's time in prison. Curry instead argued during closing arguments that the jury would have to determine whether Petitioner

---

[7] Robert Kimbrew, Tina's father, and Elaine Kimbrew Thornhill, Tina's mother, did testify at trial, during the State's rebuttal, about meetings they had with Petitioner while he was in prison. Robert Kimbrew testified that his meeting with Petitioner occurred in November 1996 and was coordinated through a prison mediation program. At that meeting, Petitioner told Mr. Kimbrew that he had never hurt anyone before he murdered Tina. (R. 27:32-3). Mrs. Thornhill testified that she met with Petitioner as part of the same program in June 1997, and he also told her that he had never hurt anyone before Tina. (R. 27:37-8). These statements were, of course, not true.

would be a future danger in prison society and that the pen packet only indicated two arguments with other inmates in over eleven years of confinement, even in a violent place such as prison. Curry then argued that this was evidence that Petitioner could conform himself under a regimented system and would not be a threat to anyone. (R. 28:21-2).

*Further Evidence Submitted to Federal Court*

Petitioner has submitted to this Court records from the TDCJ reflecting that Petitioner attended classes while previously in prison, including art, special education, horticulture and construction classes. These records also indicate that Petitioner took and passed the GED exam. (Pet. Rec. Ex. #20). Petitioner has also submitted evidence that Petitioner wrote sports-related articles as a unit reporter for the monthly prison newsletter. (Pet. Rec. Ex. #21). Petitioner has also submitted an affidavit from his investigator, F. David Moore. In this affidavit Moore states that, as part of his investigation, he spoke with Sergeant Gary Faulkenberg of the Texas Department of Criminal Justice and that Faulkenberg remembered Petitioner from his previous time in prison and recalled that Petitioner participated in attempts to raise funds from the community to assist a young man with emergency medical needs. Moore also states in his affidavit that all other employees of TDCJ he contacted were reluctant to cooperate, fearing reprisals from their immediate supervisors. (Pet. Ex.:#D-14 [Rec. Ex. #28]). Respondent has also submitted a direct affidavit from Faulkenberg, in which he states that he told Investigator Moore that Petitioner had no major disciplinary cases against him when he was incarcerated, but did not tell Moore about any charity fundraising event organized by Petitioner, and would not have willingly testified on Petitioner's behalf. (Resp. Ex. #R-32).

The parties have stipulated to this Court that, in August 1992, there was a fund-raiser held in the TDCJ unit where Petitioner resided for a local boy who needed an organ transplant. (Joint Advisory, 1/4/07). Finally, the parties have stipulated that, contained in the Wichita County District Attorney's files, which were open to Curry, were notes of an interview the State conducted with a man named Stephen Wood, who was in prison with Petitioner in 1997 before Petitioner and Wood were paroled. (Joint Advisory, 1/4/07). In these notes, it is stated that Wood described Petitioner as a "con man" and a "freak" with an anger problem, who had the guards and counselors fooled that he was a model prisoner, but who had another side to him when he got mad, such that the other inmates would stay out of his way. (Resp. Ex. #R-24).[8]

## Analysis

The Supreme Court has stated in *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003), that, in order to determine whether a limited investigation into potential mitigating evidence is reasonable, a court must determine whether trial counsel used "reasonable professional judgment" to support the decision not to pursue certain potential mitigating evidence. In the instant case, the record before this Court is that defense counsel was aware of Petitioner's minimal disciplinary record from prison but, according to his own testimony from the evidentiary hearing, Curry did not make a strategic decision to end further investigation into Petitioner's prison record. Instead, he testified that he did not contact any inmates or employees of the prison system who might have information about Petitioner and could not provide this Court with any reason for his failure to do so. This Court therefore cannot find that Curry exercised "reasonable professional judgment," as defined by

---

[8] Wood was listed as a witness on the State's witness list, filed with the trial court on September 17, 1999. (Tr.:152)

*Wiggins*, in his decision to conduct at best an extremely limited investigation into Petitioner's prior prison record. Instead, under the *Strickland* standard, as further explained by the Supreme Court in *Wiggins* and *Rompilla*, trial counsel provided ineffective assistance of counsel by not further investigating Petitioner's record while in prison and providing no trial strategy for his failure to do so. Accordingly, the state court's determination that trial counsel provided effective assistance of counsel in this regard because he exercised a legitimate trial strategy is an unreasonable application of the *Strickland* standard.

Having determined that Petitioner's trial counsel was ineffective for failing to further investigate evidence of Petitioner's prison record, this Court must now determine whether Petitioner was prejudiced by this failure. Therefore, under the *Strickland* standard, this Court must determine whether, had counsel investigated and presented further evidence of Petitioner's prior prison record, there is a reasonable probability that he would not have been sentenced to death. The record from the trial reflects that, an hour and a half into their deliberations, the jury sent a note to the trial court asking the court to define whether a threat to society meant public or prison. The court responded that there was no specific definition for the terms referenced in the note. (R. 28:36-7). This note from the jury suggests that the jury, in deliberating Petitioner's sentence, was at the time the note was sent in the process of determining whether Petitioner would be a future danger to society.[9]

_____

[9] At Petitioner's trial, the jury had to answer the following three questions:

(1) Was the conduct of the defendant, Faryion Edward Wardrip, that caused the death of Terry Sims committed deliberately and with the reasonable expectation that the death of Terry Sims would result?

(2) Is a probability that the defendant, Faryion Edward Wardrip, would commit criminal acts of violence that would constitute a continuing threat to society?

(3) Is there, taking into consideration all of the evidence, including the circumstances of

Petitioner argues that prejudice has been shown because, had his trial counsel submitted the evidence presented to this Court that he took several classes in prison, wrote for the prison newspaper, and participated in a fund-raiser for a local boy who needed urgent medical treatment, there is a reasonable probability that the jury would not have unanimously determined that he was a future danger to society and therefore he would not have been sentenced to death. In response, Respondent has presented evidence that calls into question Petitioner's evidence that he participated in the fund-raising event and evidence that the State had spoken to one former inmate prior to trial who knew Petitioner and believed he was a con man with an anger problem.

In the jury charge, the jurors were informed that a "yes" answer to the first two special issues required unanimity and a "no" answer required that ten jurors agreed and a "no" answer to the third special issue required unanimity and a "yes" answer required ten votes. (Tr.:160). The jurors were further instructed that, if they answered the first two issues "yes" and the third "no" Petitioner would be sentenced to death, and if they answered either of the first two questions "no" or the third one "yes" he would be sentenced to life imprisonment. (Tr.:162). And, under Texas law, although the jurors themselves were not told this, if the jurors were unable to arrive at a unanimous answer of "yes" to the first two special issues or "no" to the third special issue, Petitioner would have been sentenced to life in prison. *See Nichols v. State*, 754 S.W.2d 185, 204 (Tex. Crim. App. 1988), *overruled on other grounds by Green v. State*, 764 S.W.2d 242 (Tex. Crim. App. 1989); *see also* TEX. CODE CRIM. PROC. ANN. Art. 37.071 § 2(g)754 S.W.2d 185 (Vernon 2005). Furthermore, the

---

the offense, the defendant's character and background, and the personal moral culpability of the defendant, a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

The jury answered "yes" to the first two questions and "no" to the third, thereby sentencing Petitioner to death. (Tr.:164-65).

jury was not told about Petitioner's parole eligibility should he be sentenced to life in prison, which would have been twenty years under Texas state law at the time. *See* Act of Sept. 1, 1991, 72nd Leg., R.S., ch. 652, § 10, 15(b) (amended 1999).

In order for Petitioner to be sentenced to death, the jury had to, among other things, unanimously find that there was a probability that Petitioner would commit criminal acts of violence that would constitute a continuing threat to society. (Tr.:159-60, 162). As noted earlier, a note received by the trial court from the jury indicates that at least one juror was interested in whether a continuing threat to society meant public or prison society. The trial judge did not, however, define the term "society" for the jury. In order to establish prejudice, Petitioner must show that there is a reasonable probability that, but for John Curry's failure to investigate and present evidence of Petitioner's record and behavior while previously in prison, the result of the proceeding would have been different. And in *Strickland*, the Supreme Court defined a "reasonable probability" as a probability sufficient to undermine confidence in the outcome. Accordingly, in order for Petitioner to be entitled to relief this Court must conclude that, had John Curry's further investigated Petitioner's prison record and presented evidence of such at trial, there is a probability sufficient to undermine confidence in the outcome that Petitioner would not have been sentenced to death. And, in order for Petitioner to be entitled to relief, this Court must also further conclude that the state habeas court's determination that Petitioner had failed to prove either prong of the *Strickland* standard is an unreasonable application of that standard. Given the evidence from the jury note received by the trial judge indicating that the jury appeared to be deliberating about Petitioner's future dangerousness while in prison, given the fact that the jury was not given any information about parole eligibility, and given the fact that in order for the outcome of the proceeding to have

been different only one holdout juror was needed to decline to answer the future dangerousness issue in the affirmative, this Court finds that a probability sufficient to undermine confidence in the outcome has been shown that Petitioner would not have been sentenced to death had his defense counsel presented any evidence about his nearly spotless record and his commendable behavior during his prior eleven-year incarceration. Furthermore, this Court concludes that the state habeas court's resolution of this claim was an unreasonable application of the *Strickland* standard. As the Supreme Court noted in both *Wiggins* and *Rompilla*, a federal court may determine that a state court's application of the *Strickland* standard is unreasonable when defense counsel fails to investigate potentially mitigating evidence without any reasonable strategy for failing to do so, fails to present such evidence, and it is shown that there is a probability sufficient to undermine confidence in the outcome that, had such evidence been presented, the defendant would not have been sentenced to death. Such has been shown here. It is recommended that Petitioner's second ground for relief be granted.

### c.     Evidence of transformation

In his third ground for relief, Petitioner argues that his trial counsel was ineffective for failing to present evidence of Petitioner's "complete transformation" in the intervening years since he committed the murders. In particular, Petitioner alleges that, although his trial counsel did ask him to compile a list of individuals who would be willing to testify for him at trial, Curry failed to contact some of these witnesses and mistakenly believed that others would be reluctant witnesses, when in fact they were willing to testify on Petitioner's behalf. Petitioner further contends that Curry failed to make any independent investigation to find witnesses and that, had he done so, he would have found other witnesses willing to testify for Petitioner. All of these potential witnesses

would have testified that Petitioner had changed in the intervening thirteen years between the five murders and his trial.

Based on John Curry's affidavit, the state habeas court found that: 1) counsel made the strategic decision not to call Larry Revell, Ken Bishop, and Petitioner's wife as witnesses; 2) Petitioner did not want to call his wife as a witness; 3) trial counsel instead called as a witness the owner of the business where Petitioner worked after he was paroled; and 4) trial counsel made the strategic decision not to pursue the "changed man" defense because trial counsel believed that the jury would conclude that Petitioner controlled his behavior in prison in order to be paroled and on parole in order to prevent his parole from being revoked. (SHTr.:138-40, #27-31, 35-9). The habeas court then concluded that Petitioner had failed to establish both deficiency and prejudice with regard to his claim that trial counsel was ineffective for failing to call additional witnesses at trial. (SHTr.:155-56, #19-23).

## Applicable Facts

### *Testimony at Evidentiary Hearing*

At the evidentiary hearing, Curry testified that Petitioner had given him a list of people who might be willing to testify on his behalf. (10/11 EH:113-14). He also, by way of a letter to Curry, informed him that he felt physically and mentally abused by his father, was afraid of him, grew up hating him, and had deep depression because of this. (10/11 EH:231). On August 9, 1999, he provided this list of witnesses to his investigator, Dana Rice. This list included people Petitioner knew after he was paroled and seven members of his family. (10/11 EH:27, 34, 118). He delegated to Rice the task of contacting the witnesses because, in his experience, she had a "knack" for getting people to open up to her. Along with this list, he gave Rice a questionnaire to use and a memo with

instructions for her. In determining who to call as a witness, Curry relied on her written notes and verbal input and personally spoke to only approximately five of the thirty people suggested as possible witnesses. (10/11 EH:33-5, 130, 139-40, 209, 217). Curry also testified that he made the decision not to hire a mitigation expert because he believed that this was an investigation the Public Defender's office could conduct, as it had in the past. (10/11 EH:54). Curry further testified that he chose to wait a period of time before asking Rice to contact potential character witnesses for Petitioner because Petitioner had been living in the small town of Olney, Texas, and due to the fact that these people did not know Petitioner's history coupled with the publicity from the case, Curry did not believe that immediate interviews with friends or family would be fruitful. (10/11 EH:49-50).

In any event, in Spring 1999, prior to providing Rice with the list of potential witnesses, the only steps Curry took to determine what Petitioner's life was like prior to his time in prison was to speak to Petitioner himself and his sister, Alice Sutherland (now Alice Milhullon). He had no other contact with Petitioner's family (10/11 EH:74; 101). And, Curry never initiated contact with Petitioner's family. Instead, Alice called him sometime after Petitioner was arrested. (10/11 EH:102-03). But, contrary to Petitioner's allegations of child abuse, she denied that there was any such abuse in the family. (10/11 EH:103). Curry chose not to contact the other members of Petitioner's family because Alice had told him that, because Petitioner had admitted to killing the five women, the family's relationship with him was strained, and she did not believe that it was a good time to contact them. (10/11 EH:103-04). Instead, Curry waited and asked Dana Rice to contact some family members in August. (10/11 EH:105). Curry never asked Petitioner's parents if they were willing to cooperate with the defense. (10/11 EH:267-68). And, Curry did not

investigate further Petitioner's claims of physical abuse by his father. (10/11 EH:268-70). Curry also did not attempt to obtain Petitioner's records, such as educational and medical records, from the family. (10/11 EH:105).

Other than the members of Petitioner's family, none of the potential witnesses on the list Curry provided to Dana Rice knew Petitioner before he was paroled and therefore did not have any knowledge regarding how Petitioner was prior to the time he was paroled. (10/11 EH:121-22). Curry decided not to put reluctant witnesses on the stand because, in his experience, juries can sense a reluctant witness's resentment, and therefore there was a greater risk of harm from their testimony. (10/11 EH:148-49). He did not call Scott Clark because he had a mixture of good and bad things to say about Petitioner, and Curry was concerned that if he testified, information about Clark counseling Petitioner about his anger and the need for anger management would be revealed. (10/11 EH:157, 159, 247). After discussions with Petitioner, Curry made the decision not to call Petitioner's wife, Glenda Curry, as a witness because Petitioner was concerned about her well-being, as it was difficult for her to attend the trial, and she left before it was over. (10/11 EH:248-50). Otherwise, Curry did not recall the specific reasons why other witnesses that were contacted were not called or why Dana Rice was, according to her notes, unable to contact certain witnesses. (10/11 EH:157-58, 160-61).[10]

*Evidence Presented at Trial*

At trial, defense called as witnesses Petitioner's boss, Fred Duncan, and Petitioner's parole officer, John Dillard. Duncan testified that he owned Olney Door & Screen, that he hired Petitioner

---

[10] No testimony was taken from Dana Rice in the hearings held by this Court because she was not available to testify due to medical reasons. (11/1/06 EH:164-68).

after he was paroled because Petitioner's father is a friend of his, that he did not initially know that Petitioner had been in prison, but that Petitioner was an excellent employee. He further testified that one of the positions Petitioner held at the company was working for Dave Collard, who was the purchasing agent, where he was an excellent employee. Duncan further testified that Petitioner was a reliable worker who never missed a day. On cross-examination, Duncan acknowledged that he was led to believe that Petitioner had been to prison on a vehicular homicide charge and that he had little contact with Petitioner outside of work. (R. 27:13-18). Dillard testified that he was Petitioner's parole officer for a year and a half, he was on super-intensive supervision meaning he was electronically monitored and could only leave the house to go to work, counseling, and church, and that Petitioner abided by these restrictions. Dillard further testified that Petitioner completed anger management counseling, Alcoholics Anonymous counseling, and Narcotics Anonymous counseling, that Petitioner continued to attend AA and NA after he was no longer required to do so, and that he was one of the best clients Dillard had had. (R. 27: 20-25).

The State admitted into evidence at trial both Petitioner's school records from Marion, Indiana, and his military records from the United States Army National Guard. The school records reflect his grades from elementary through high school, and indicate that he did not attend school past the eleventh grade and that his grades varied from As to Fs, but he received mainly Cs and Ds. (State Trial Ex. #143). The military records reflect that Petitioner enlisted in 1978, in 1979 was charged with fifty-four unexcused absences, and was discharged in 1980 under less than honorable conditions due to his "conduct and willful absences." (State Trial Ex. #144).

*Further Evidence Presented to Federal Court*

As support for this claim, Petitioner has submitted several affidavits to this Court, both with his petition and pursuant to the hearings held in this case. In their affidavits, Larry Revell, Ken Bishop, Dave Collard, and Johnny Suits all state that they knew Petitioner after he was paroled and living in Olney, Texas. Revell states that he was a co-worker and attended church with Petitioner; Bishop states that he has known Petitioner's family for a long time and knew Petitioner after he was paroled; Collard states that he was a co-worker and friend of Petitioner's; and Suits states that he attended church with Petitioner and he and his wife became friends with Petitioner and his wife. All state that they believe that Petitioner was a changed man. Revell states that Petitioner attended church and taught Sunday School and was a kind, caring, and responsible person; Bishop states that Petitioner grew up over the years; Collard states that Petitioner was a very active Christian, genuinely practiced his faith, and was a capable and reliable worker; and Suits states that he visited Petitioner in prison, continues to correspond with him by letter, and believes that Petitioner committed the murders because of his heavy drug use. All four men also state in their affidavits that they were never contacted by the defense, but would have been willing to testify at trial. (Pet. Rec. Ex. #22-24, 26 [#D-3, D-5, D-9]).

In his affidavit, Scott Clark states that he spoke with someone from the Public Defender's office on two occasions prior to Petitioner's trial. In these conversations, he informed them that he would be a reluctant witness, because he would have had both positive and negative things to say about Petitioner. On the one hand, he could have testified that, as Petitioner's minister, he baptized Petitioner, officiated his wedding, observed him attend church and bible classes regularly, and visited Petitioner in jail after his arrest, where he again baptized him at Petitioner's request for forgiveness of the sins he had committed. But, Clark also believed that the ordeal had traumatized

his church because Petitioner had lied to everyone about the nature of his criminal past. And, Petitioner had also told Clark that he struggled with his temper and had at one point been frustrated to the point of wanting to hit his wife. (Pet. Ex. # D-4). Betty and her son, Brad Duncan, state in their affidavits that they employed Petitioner, that he was an excellent employee, and that they knew his wife and had attended his wedding. They also both state that they were never contacted by the defense and would have testified if asked to do so. (Pet. Ex. #D-7, D-8). And Charles Perry states in his affidavit that, had he testified, he would have had both good and bad things to say about Petitioner, as Petitioner lied to everyone about the reason he was in prison, telling people that he killed a woman in a car wreck. But, Petitioner attended church with Perry, Petitioner attended three times a week, and his reputation in the community was that of a good, prompt worker. (Pet. Ex. #D-15).

In her affidavit, Petitioner's sister, Alice Milhollon (formerly Alice Sutherland), states that Petitioner appeared to be a changed man when he was on parole and was living with her family. He seemed remorseful for killing Tina Kimbrew, he had become a Christian, she was never afraid of him while he was on parole, and she allowed him to play with her children. Milhollon further states that her family was shocked when they learned of the other murders, and Petitioner told them that he had blocked out the memory of the crimes. Finally, she states that she spoke to defense counsel briefly by telephone one time, that Curry did not ask for any details about Petitioner's life, that he did not ask her to testify, and that she would have testified on Petitioner's behalf if asked. (Pet. Ex. #25 [#D-10]). In her first affidavit, Linda Willis, who had been married to Petitioner's brother, Rory, states that she began writing to Petitioner while he was in prison beginning in 1992, continues to write to him, knows him to be a devout Christian, knows him to be remorseful, and knows that

he continually helps those around him in prison. She acknowledges that she did not correspond much with him after his marriage, but began writing him again after his arrest in 1999. She further states that she was never contacted by the defense, but would have testified on Petitioner's behalf regarding his faith, his remorse, and the fact that he no longer does drugs and completed his education in prison. (Pet. Rec. Ex. #27 [#D-11]). In a subsequent affidavit, Linda Willis states that her former husband, Rory Wardrip, had severe substance abuse problems that ruined their marriage and caused him to be homeless. She also states that Rory told her that he grew up poor, that his father was angry and mean and would physically abuse the boys. She also states that her ex-husband had a violent temper, had been hospitalized several times for substance abuse treatment, and had been diagnosed as having bipolar disorder. (Second Willis affidavit, pp. 1-2).[11]

The State has submitted affidavits from Lee Hughes, Peggy Hughes, Jamie Goad, Charles Perry, and Sam Spurlock, people who were also included on the list of potential witnesses provided by Petitioner. Lee and Peggy Hughes state in their affidavits that they were contacted by someone prior to trial, requesting that they testify on Petitioner's behalf, and they declined. They further state that they attended church with Petitioner, and he was engaged to their daughter for a period of time, but she ended the engagement because she was afraid of Petitioner because he would watch their house constantly from his job and would call her all of the time checking up on her. (State's Ex. #R-33, R-34). Jamie Goad states in his affidavit that he attended church with Petitioner, and he was contacted by the Public Defender's office and was asked to testify for Petitioner, but he declined to do so because Petitioner is a murderer and a liar who lied to the church by telling them that he had

_____

[11] Petitioner filed this affidavit in rebuttal on December 18, 2006, after the evidentiary hearings in this case. Petitioner notes on the notice that Respondent objected to the admission of this affidavit into evidence. (*See Notice of Intent to File Rebuttal Affidavit to Testimony Heard During Trial*, dated 12/18/06).

been in prison because he accidentally killed his girlfriend in a drunk driving accident. (State's Ex.#R-35). Charles Perry, who also provided an affidavit to Petitioner, states in the affidavit he provided to the State that he attended church with Petitioner, and he did not believe that he would or could have testified for Petitioner because he was in poor health at the time of the trial and because he did not have anything good to say about him. (State's Ex. #R-36). In his affidavit, Sam Spurlock states that he attended church with Petitioner, and he recalls being contacted by attorneys representing Petitioner. He would not testify for Petitioner because of the lies he told and all of the people he hurt. (State's Ex. #R-37).

The State has also submitted to this Court notes contained in the District Attorney's open file concerning an interview conducted with Petitioner's ex-wife, Johnna Wardrip Gray, in which she detailed the physical abuse she received from Petitioner. (State's Ex. #R-27). The State has also submitted an affidavit from Petitioner's brother, Bryce, in which he states that his father did not abuse alcohol, the family was not poor, Petitioner did not attend the "poor" schools as there were few schools in Marion, Indiana, and they were not physically abused by their father. He also states that his parents moved back to Texas from Indiana so that Petitioner could be released into their custody when he was paroled, that the family did not know about the other four women Petitioner had murdered, that he was never contacted by John Curry, but that he told the State that he was willing to testify regarding his family's true history if called. He further states in the affidavit that, at the time of Petitioner's trial, he and his wife were the only family members of Petitioner's in town, as the rest had returned to Michigan or Florida. He also disputes that his sister Alice would have been willing to testify for Petitioner. (State's Ex. #R-3).

Curry's trial file includes the letter from Curry to Dana Rice, asking her to contact the witnesses provided by Petitioner, along with a questionnaire to use and the list itself. (Pet. Ex. #D-1, pp.44-6, 62). Notes in the file, identified by Curry as being in Dana Rice's handwriting, reflect that she spoke to Scott Clark, Betty Duncan, Delton and Martha Williams, Neil Rowe, Dennis Herring, Ken Bishop, Kent and Elizabeth Jackson, Charles Perry, Sam Spurlock, and Peggy and Lee Hughes, all of whom were names provided by Petitioner as potential character witnesses. (Pet. Ex. #D-1, pp.60-1, 67-9, 70, 192-3). Her notes further state that Betty Duncan believed that her son and her husband would be better witnesses, the Williams family was going to be out of town, Neil Rowe did not want to testify, Dennis Herring believed in the death penalty if Petitioner was guilty, Kenneth Bishop was a good friend of Petitioner's father, but did not really know Petitioner, the Jacksons had nothing bad to say about Petitioner, Charles Perry said that Petitioner had temper problems and did not want to add fuel to the fire, Sam Spurlock did not want to testify, and the Hughes did not want to testify. (Pet. Ex. #D-1, pp. 67-9, 208). These notes indicate that, on October 29, 1999, Rice traveled to Onley, Texas and spoke to Brad and Fred Duncan in order to inform them when they should be present at the trial as witnesses and in order to further assess whether Brad should be used as a witness. (Pet. Ex. #D-1, p. 219). The notes also indicate that Dana Rice interviewed Petitioner's sister, Alice, in October 1999. The notes state that, at that interview, Rice spoke with her in great detail, and Alice stated that there was no abuse in the family, Petitioner was giving a false story about abuse, and that their father never spanked them, but their mother did. These notes further state that Alice informed Rice that the parents were "destroyed" because Petitioner's allegations of child abuse had been made public. These notes also state that, because of these allegations, Alice "will not beg for the jury to let him live," and that Petitioner's parents had moved to Florida at the time

of the trial. (Pet. Ex. #D-1, pp. 65-6).[12]  Notes from Rice in Curry's trial file also indicate that she recommended calling as character witnesses Petitioner's wife, Glenda Wardrip, Fred Duncan, Brad Duncan, and John Dillard.  She did not recommend calling Scott Clark, but stated in her notes that it should be Curry's decision. (D-1:194).

## Analysis

The record before this Court, based on John Curry's testimony, notes contained in his trial file, and affidavits filed with this Court from both parties, is that Petitioner provided his attorney the names of a number of people who might testify on his behalf and that Curry called two people as witnesses for Petitioner. Curry made the strategic decision not to call Petitioner's sister because of her perceived reluctance, based on notes from his investigator and his discussion with her, and decided not to call Petitioner's wife as a witness after consultation with Petitioner.  The record before this Court indicates that the defense also contacted Petitioner's minister, Scott Clark, and friends of Petitioner's, including Charles Perry, Lee and Peggy Hughes, Jamie Goad, and Sam Spurlock, and that the Hughes, Goad, and Spurlock all declined to testify for Petitioner, and Clark and Perry had both good and bad things to say about Petitioner.  Curry specifically recalls deciding not to call Clark as a witness, but has no recollection about the other witnesses.

The defense also spoke to Petitioner's sister, who disputed Petitioner's claims of child abuse, but had other good things to say about Petitioner.  However, there is an apparent conflict in the record regarding whether Alice was willing to testify for Petitioner.  Her sworn affidavit to this Court states that she would have testified, if asked, but Dana Rice's notes indicate that she would

---

[12]  Fred Duncan testified at trial that he had spoken to Petitioner's parents the previous week, but believed that they were visiting Florida at that point in time. (R. 27:18-19).

not ask the jury to spare his life. There is also a dispute in the record between the affidavits of Betty and Brad Duncan, who both state that they were not contacted by the Court and were willing to testify that Petitioner was an excellent employee, and notes from Dana Rice that reflect conversations she had with both of them. Finally, there is a dispute between Rice's notes and an affidavit from Ken Bishop, a friend of the family, as her notes reflect that she spoke to him and he stated that he did not really know Petitioner, whereas in his affidavit he states that he was never contacted by the defense and would have testified if contacted.

The record also indicates that Larry Revell, a friend and fellow church member of Petitioner's, Dave Collard, a friend and co-worker, and Johnny Suits, a fellow church member were not contacted by the defense and would have testified for Petitioner that Petitioner attended church regularly, was a capable and reliable worker, and in their opinions was a changed man. The record further indicates that Petitioner's sister-in-law was also not contacted and was willing to testify about her relationship with Petitioner (evidently one that existed through letters) and would have been willing to testify to her belief that Petitioner had changed since the murders and testify about information she had about Petitioner's brother. Finally, the record before this Court reflects that no other members of Petitioner's family were contacted by the State, but Petitioner's brother, Bryce Wardrip, was listed by the State as a potential trial witness and had stated his willingness to testify for the State regarding his perspective of their upbringing, and Petitioner's sister Cathy Wardrip Hardin and her husband Jay Hardin, his sister Alice Sutherland, his sister Valerie Wardrip Steiner, and his parents Dianna and George Wardrip were also listed by the State as potential witnesses. (Tr.:145, 150-51).

If counsel has made an adequate investigation, any conscious and informed decision made based on trial tactics and strategy cannot be the basis for a claim of having received ineffective assistance of counsel unless the decision was so poorly chosen that it "permeates the entire trial with obvious unfairness." *United States v. Cotton*, 343 F.3d 746, 753(5th Cir. 2003), *quoting United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002); *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002).  Moreover, under the *Strickland* standard, a determination must be made regarding whether trial counsel used "reasonable professional judgment" to support a limited investigation into potential mitigation evidence.  This analysis is done by conducting an objective review of counsel's performance under the prevailing professional norms, in the context of counsel's perspective at the time of trial. *Wiggins*, 539 U.S. at 522-23.

In the case at hand, Curry made a decision, based on trial strategy and relying on notes from his investigator, not to call Scott Clark and Petitioner's sister Alice.  Although Alice in a sworn statement has since said that she would have testified on Petitioner's behalf, Curry used reasonable professional judgment in relying on his investigator's notes indicating that she would be a reluctant witness due to her unhappiness about Petitioner's claims of child abuse.[13]  Curry also exercised reasonable trial strategy in declining to call Scott Clark as witness, as he himself acknowledges in

_____

[13]  In his post-hearing brief, Petitioner criticizes both Curry's decision not to ask the trial court for funds with which to hire a mitigation expert to investigate potential mitigating evidence and his decision to rely on the public defender's office investigator to conduct the investigation.  Petitioner has cited to no authority that failure to hire a mitigation expert is *per se* ineffective.  And, while he alleges the Dana Rice was not competent to conduct the investigation because she attended high school with one of the victims and was taking lithium for bipolar disorder at the time of the trial, Petitioner has presented no evidence that Rice had any particular feelings for Tina Kimbrew one way or the other and has presented no evidence that Rice was incompetent merely because she took medication for an illness.  Finally, to the extent that Petitioner is asserting that the defense was operating under an actual conflict of interest because Rice knew one of the victims, this would be an unexhausted new claim, which this Court declines to address.

his affidavit that he would have been a reluctant witness because of the mixed bag of information he had about Petitioner. Furthermore, given the statements in their affidavits, Curry was not ineffective for failing to call several other people from Petitioner's list, including Lee and Peggy Hughes, Jamie Goad, Charles Perry, and Sam Spurlock, as they were either unwilling to testify for Petitioner, did not have good things to say about him, or both. And, defense counsel was not ineffective for failing to call Ken Bishop or Betty and Brad Duncan as witnesses, as Bishop could only have testified that Petitioner "grew up" over the years and Betty and Brad Duncan's testimony would have been cumulative to the testimony given at trial by Fred Duncan regarding Petitioner's work after he was paroled.

The record does not, however, reflect that Dave Collard, Johnny Suits, or Larry Revell were ever contacted by the defense, even though these names were provided to trial counsel by Petitioner, and there is no indication of a reason for this, either in Dana Rice's notes or through John Curry's testimony at the hearing. Likewise, other than his sister, Alice, and his wife, Glenda, no member of Petitioner's family appears to have been contacted by the defense, Curry was unable to provide a reason for this, and other than notes from a conversation with Alice regarding her parents' feelings about Petitioner, his trial file provides no reason for this, either. Accordingly, this Court cannot conclude that defense counsel used reasonable trial strategy in declining to contact these people.

Even were this Court to consider this failure ineffective assistance of counsel, however, Petitioner has not met the *Strickland* standard because he has not shown that he was prejudiced by this failure. With regard to Petitioner's assertion that his counsel was ineffective for failing to contact Petitioner's family members and present testimony regarding his upbringing and childhood and how he had changed and transformed since then, other than affidavits from his sister Alice, who

does not address Petitioner's upbringing in her affidavit, and from Linda Willis, who did not know Petitioner until after he was in prison and could not therefore give any firsthand admissible testimony about his childhood, Petitioner has presented no evidence that Petitioner's other family members were available and willing to testify on his behalf and has failed to present what this testimony might have been. Indeed, while this Court cannot know why several of Petitioner's siblings and his parents were listed as potential witnesses for the State, the fact that they were listed as such might be an indication of the level of their willingness to testify for Petitioner. This Court is unable to determine whether there actually was child abuse or deprivation in Petitioner's past, but the only firsthand evidence before this Court on this issue is an affidavit from Bryce Wardrip in which he vehemently denies any such allegations. But, in any event, without such a showing of what testimony his family members would have given if called as witnesses, prejudice has not been shown.[14] Moreover, while Petitioner has presented several affidavits from men who knew Petitioner after he was paroled, Petitioner has not shown a reasonable probability that, had Larry Revell, Dave Collard, and Johnny Suits testified regarding Petitioner's general good character traits, such as being a good employee and attending church, he would not have been sentenced to death. *See Carter v. Johnson*, 131 F.3d 452, 465 (5th Cir. 1997) (holding that Carter was not prejudiced by counsel's failure to investigate, discover, and present the testimony of character witnesses, as there was no reasonable probability that testimony that he was a "good and peaceful person" would have resulted in a life sentence, given that Carter had confessed to two murders). The state court's conclusions

---

[14] The only records before this Court of Petitioner's life before the murders, other than medical records, are his school and military records, both of which were placed into evidence at trial by the State.

did not result in a decision contrary to federal law. Petitioner's third ground for relief is without merit, and it is recommended that it be denied.

### d. Psychiatric evidence

In his fourth ground for relief, Petitioner contends that his trial counsel was ineffective for failing to present psychiatric testimony as mitigating evidence at punishment. In particular, Petitioner asserts that the fact that Petitioner was a drug addict when he committed the murders, he had had mental health issues, he was on anti-depressants while in jail, and he had diabetes and therefore a limited life expectancy were "red flags" indicating that mental health expert testimony should have been developed and presented at trial. Petitioner contends that, had such an expert been presented at trial, the defense could have shown that Petitioner would not be a future danger in prison because it could have been shown that drug use was a contributing factor to the murders that could have been ameliorated in prison and that Petitioner's age and the lack of any severe altercations during his prior confinement was further evidence to rebut the State's claim that Petitioner would be a future danger to society.

When it addressed this issue, the state habeas court found that trial counsel did seek, and obtain, funds with which to obtain the services of a psychologist. Based on the record and John Curry's affidavit, the state habeas court found that Curry obtained the services of a psychologist, Dr. Leon Morris, who examined Petitioner and reviewed some past medical records, but Curry made the strategic decision not to call Morris as a witness because Morris informed him that Petitioner was not truthful in his answers to the test Morris gave him and that, therefore, Morris could only diagnose Petitioner as malingering. Moreover, the state habeas court found that Morris was hired as a mental health expert, not only to evaluate Petitioner's competency. (SHTr.:141-43, #49-52, 56-

59). The state habeas court then concluded that trial counsel was not deficient for failing to present psychiatric testimony and that, in light of the evidence that Petitioner had committed five murders, three aggravated kidnappings, and two aggravated sexual assaults, Petitioner had failed to establish by a reasonable probability that he would not have received the death penalty had trial counsel presented mental health testimony on the issue of future dangerousness. (SHTr.:157-58, #28, 31).

## Applicable Facts

### *Testimony from Evidentiary Hearing*

Prior to trial, defense counsel sought, and obtained, funds with which to hire both a psychologist and a psychiatrist to examine Petitioner. (Pet. Rec. Ex. #4). In a letter Curry sent to Morris after the funding was approved, Curry asked Morris to determine whether Petitioner had changed and whether factors that caused him to kill no longer exist or are under control, such as his prior drug use and anger. (Pet. Rec. Ex. #5).

Curry testified at a hearing held by this Court that, in May 1999, he asked the trial court to appoint Dr. Jack Tomlinson and Dr. Leon Morris to aid him in an evaluation of his client.(10/11 EH:26).[15] He was interested in having them evaluate Petitioner because Petitioner had told him that he had been in a car accident in which he sustained a head injury. Also, Petitioner had informed him that he had received some treatment for mental health issues and drug and alcohol abuse. (10/11 EH:55). He chose these men because he had worked with them in the past and knew that he would hear their honest opinions. Also, Dr. Morris, a forensic psychologist, had testified in court in a number of Curry's cases, and Curry knew that Morris had an interest in serial killers. (10/11 EH:55-

---

[15] Petitioner asks this Court in his post-hearing brief to find that the testimony given at the hearing by Morris and Tomlinson was not credible, but points to no testimony that was not worthy of belief. Indeed, Petitioner cites to some of this testimony as support for this claim. This Court declines to find their testimony incredible.

6).  He asked Dr. Morris not to make a written report because, had he testified, it would have had to have been turned over to the prosecution. (10/11 EH:111). Curry also did not provide records of treatment Petitioner received for drug and alcohol abuse in the 1980's because his experience was that Dr. Morris would obtain those records on his own. (10/11 EH:68).  After Petitioner was examined, Morris informed Curry that they had discovered no useful information because Petitioner had been malingering. (10/11 EH:81-2).  Curry also recalled that Morris told him that, while Petitioner had been in a car accident, there was no indication in the hospital records that he had sustained a significant head injury. (10/11 EH:79-81).  Curry also testified that he recalled that Dr. Morris gave his opinion to investigator Dana Rice that Petitioner had an antisocial personality. (10/11 EH:253).

Curry did not want to present testimony from Dr. Morris because of the malingering diagnosis.  He was concerned that it would show an attempt by Petitioner to manipulate the situation he was in. (10/11 EH:179-80). He did not seek funds for a second opinion from other experts because he did not have any confidence that someone else would give him a different answer. (10/11 EH:85-6).  Curry did acknowledge that he received a letter from Dr. Morris dated June 14, 1999, stating that a sleep-deprived EEG could be performed on Petitioner, but Curry did not seek funds to have this testing done and does not recall why he did not seek such funds. (10/11 EH:77-8, 110). He did not request funds for an additional expert who could testify based on records such as his education, prior drug abuse, and upbringing because he did not believe such evidence would be successful due to the number of victims and the brutality involved. (10/11 EH:180-81).

Dr. Leon Morris and Dr. Jack Tomlinson also both testified at an evidentiary hearing held by this Court on November 1, 2006.  Dr. Morris testified at the hearing that he is a fellow with the

American College of Forensic Psychology and serves on its advisory board. He further testified that he has testified in court over 500 times, for both the defense and the prosecution, but is most often appointed by the court. (11/1 EH:64, 66-7). Morris testified that he met with Petitioner nine times and administered numerous psychological tests including IQ and personality tests. (11/1 EH:81, 83-4). As part of his examination of Petitioner, Morris obtained Petitioner's medical records from the hospital that treated him after a car crash he had been in and from two state hospitals that treated him for substance abuse, and Morris also had Petitioner complete a personal history. (11/1 EH:97, 101). As part of this history, Petitioner told Morris that he had been abused by his father and that he had a history of substantial substance abuse and possible depression, and Morris relayed this information to Curry. (11/1 EH:143-4, 152-3). Based on the testing and the interviews with Petitioner, Dr. Morris formed the opinion that Petitioner was malingering and had an antisocial personality.[16] Morris also thought that, because of some of Petitioner's answers, there was the possibility of brain damage, but he could not determine this conclusively because he determined that Petitioner was malingering on several scoring scales he used in that Petitioner was greatly overstating or fabricating psychological problems and "faking bad" by admitting to all sorts of unusual pathological symptoms. (11/1 EH:86-89, 91-2). Morris did not believe that the crimes could have occurred when Petitioner was high on drugs or in an alcoholic stupor because they all showed a high level of planning and execution. (11/1 EH:100). Curry did not ask Morris to write a report, so Morris did not, because it was a privileged examination. (11/1 EH:147-48). Morris did tell Curry that a sleep-deprived EEG would have shown if Petitioner had temporal lobe epilepsy, but he did not believe that

---

[16] The records from one of Petitioner's previous stays in a state hospital indicate that he was diagnosed then as having an antisocial personality disorder. (11/1 EH:146).

this would change his opinion. (11/1 EH:108). He also informed Curry about Petitioner's diagnosis of malingering and antisocial personality disorder shortly after Morris and Tomlinson completed their examinations of Petitioner, and Morris advised Curry not to call him as a witness because of the negative items he found in his examination of Petitioner and because, if he took the stand, he might have to disclose on cross-examination harmful information that would overcome any positive or favorable things he would have to say about Petitioner. (11/1 EH:94, 106, 154). Morris also told Curry that, given his behavior in prison in the past, he thought Petitioner would function reasonably well in the prison setting, although he would continue to be a future danger outside of prison. (11/1 EH:104, 136, 149-50). Morris did acknowledge at the hearing that he would have liked to have had Petitioner's prison records, but they were not necessary for him to reach the opinion that he did. (11/1 EH:120-1). Besides speaking to Curry in June 1999, Morris also had a ninety-minute conversation with Dana Rice, the defense investigator, in October 1999, in which they discussed his findings, the examination, and the records he had available. (11/1 EH:138).

Dr. Tomlinson testified at the hearing that he is board certified in forensic psychiatry, but the emphasis of his practice is general psychiatry. (11/1 EH:20-2). He also testified that he was appointed by Judge Brotherton to serve as an expert in Petitioner's case, but did not speak to John Curry directly. Instead, he spoke to Dr. Morris, with whom he shares an office. (11/1 EH:8-10). He evaluated Petitioner on two separate days in June 1999 and reviewed the medical records from a car accident he had been in. Dr. Tomlinson was not provided Petitioner's school, military, or health records (11/1 EH:13-15). Dr. Tomlinson at one point suggested to Dr. Morris as a last resort suggestion that a sleep-deprived EEG could possibly be done on Petitioner to evaluate whether he had organic brain injury as a result of the car accident, but Dr. Tomlinson did not believe that his

head injury was significant from the car accident, as he had only sustained scalp lacerations and had been placed on no medications afterwards, and he relayed his opinion that it did not cause any sort of brain damage to Dr. Morris. (11/1 EH:23-4, 40-1, 45). Dr. Tomlinson also did not believe at that time that Petitioner had any mental illness or mental health problem that would have caused him to commit the crimes, and it was also his opinion at that time that diabetes could not have explained Petitioner's actions as a person with diabetes who either has too much insulin or too much sugar in their system might pass out or go into a coma, but would not be able to commit murders. (11/1 EH:41, 43-4). Tomlinson further testified at the hearing that he informed Dr. Morris that he had found nothing helpful to Petitioner's case in his examination of Petitioner and instead did not believe that Petitioner was truthful in speaking to him because he asserted that he had attended Alcoholics Anonymous meetings regularly, but could not state the twelve steps of the program. (11/1 EH:52, 58-9).

*Further Evidence Presented to Federal Court*

Petitioner has submitted as an exhibit an affidavit from a psychologist, Dr. Mark Cunningham. In this affidavit, Dr. Cunningham states that he reviewed the trial transcript, select TDCJ records of Petitioner, select school records of Petitioner, Petitioner's statements to law enforcement officers, Petitioner's pre-trial arraignment record, the state habeas application, the transcript of the suppression hearing, and the records from Petitioner's admissions into the Wichita Falls State Hospital in June and December 1985. Based on Petitioner's previous prison record, the fact that he abused drugs when he committed the murders, the fact that he was forty-years-old at the time of the trial, and the availability of mental health treatment and administrative segregation in prison, Cunningham opines that Petitioner would not be a future danger while in prison. Based on

49

an erroneous belief that Petitioner would not be eligible for parole for forty years (when in actuality, his parole eligibility would be twenty years), he opines that Petitioner would not be a future danger to society at large should he be paroled at age eighty. (Pet. Rec. Ex. #29).[17]

Petitioner has also submitted records from the Denton County Jail that Petitioner was treated for depression while he awaited trial (Pet. Rec. Ex. #17), and that while in prison he had been diagnosed as being learning disabled (Pet. Rec. Ex. #20). The Court also has before it the records from Petitioner's two admissions to the Wichita Falls State Hospital for drug abuse in 1985. These records reflect that he was voluntarily admitted for alcohol and marijuana, Valium, and amphetamine abuse on June 11, 1985 and discharged on July 12, 1985, after successfully completing the recovery program and requesting to be discharged. At that time, he was diagnosed as having an antisocial personality disorder in addition to the substance abuse diagnosis, and he was encouraged to continue out-patient treatment. The records then reflect that he was readmitted on December 9, 1985, after being brought in by the police department on a voluntary basis as being suicidal. At that time, he was diagnosed as having an adjustment disorder with a depressed mood due to his marital separation. He was discharged on January 11, 1986 because he failed to return to the facility after a work furlough. (Resp. Ex. #R-9).

Records from Marion General Hospital in Indiana have also been submitted to this Court. These records reflect that Petitioner was admitted as a patient on October 21, 1977, and was discharged on October 29, 1977, because he was injured in a car accident. He was diagnosed as

---

[17] Under Texas state law at the time, had Petitioner been sentenced to life in prison, he would have been eligible for parole in twenty years. *See* Act of Sept. 1, 1991, 72nd Leg., R.S., ch. 652, § 10, 15(b) (amended 1999). The issue of Petitioner's parole eligibility could not have been addressed at his trial, however, as Texas law did not allow such information to be given to jurors at capital murder trials except in cases where the murder or murders were committed after September 1, 1999, and then only at the request of the defense. *See* TEX. CODE CRIM. PROC. ANN. Art. 37.071, § 2(e)(2) (Vernon 1999).

having multiple skin abrasions, lacerations, and contusions. He also had fractured ribs with a collapsed lung. The hospital noted in these records that he had multiple lacerations of the scalp, but no signs of any scalp fracture. (Resp. Ex. #R-19, pp.72-82).

## Analysis

The record before this Court is that Dr. Morris informed Curry that Petitioner's medical records after the car accident indicated that Petitioner did not suffer a head injury. Morris further told Curry that he had found nothing useful in his examination of Petitioner because, in particular, he found that Petitioner was not truthful in his answers to test questions, resulting in a diagnosis of malingering. Morris also informed the defense that Petitioner had an antisocial personality disorder and that Petitioner's diabetes would not have caused him to black out during the crimes. Thus, the record before this Court is that Petitioner retained the services of a psychologist, who gave Petitioner a battery of tests and did not uncover any useful mitigating evidence, and a psychiatrist, who reviewed medical records from a car accident, found no evidence of a head injury, and did not believe, in his professional opinion, that Petitioner suffers from a mental defect or disease that would help explain the commission of the crimes.

While Petitioner has submitted documents from the TDCJ indicating that it was determined that Petitioner had some type of learning ability when he attended school in prison and has submitted documents from the Denton County jail indicating that Petitioner took medication for depression while he was awaiting his capital murder trial, Petitioner has failed to establish that trial counsel was ineffective in its investigation into potential mental health evidence. With regard to a capital sentencing proceeding, defense counsel has the obligation to conduct a "reasonably substantial, independent investigation" into potential mitigating circumstances. *Lewis v. Dretke*, 355 F.3d 364,

51

367 (5ᵗʰ Cir. 2003), *citing Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002). Defense counsel did so and made the reasonable strategic decision not to present evidence at trial from the experts he hired that was not favorable to his client. Moreover, the records before this Court regarding Petitioner's car accident support the opinion given to Curry by the experts he hired---the hospital diagnosed him as having a collapsed lung and lacerations on his scalp, but no scalp fracture. While Curry did fail to request funds with which to have an EEG performed on Petitioner, Dr. Tomlinson himself characterized this suggestion of his as a "last resort" suggestion, and no evidence has been presented to this Court that Petitioner suffers from an actual brain injury. Evidence that Petitioner was depressed while he awaited trial for capital murder or that he was diagnosed with a learning disability is not evidence that Petitioner suffers from a psychiatric disorder that might explain his actions in murdering five women.

Petitioner has also submitted an affidavit from a psychologist stating his opinion that, based on the records he reviewed, Petitioner would not be a future danger. The Court would first note that Petitioner's ground for review alleges that trial counsel was ineffective for failing to present any psychiatric evidence, not testimony from a psychologist who did not examine Petitioner. Moreover, this is not evidence that defense counsel's efforts to obtain mitigating mental health evidence constituted ineffective assistance of counsel. John Curry testified at the evidentiary hearing that he made the decision not to seek funding for an additional mental health expert to examine Petitioner because he did not believe that the result would be different. An informed decision based on trial strategy cannot be the basis for an ineffective assistance of counsel claim unless the decision was "so ill chosen that it permeates the entire trial with obvious unfairness." *Crane v. Johnson*, 178 F.3d 309, 314 (5th Cir. 1999). Given the response Curry received from the psychologist and psychiatrist

he did retain, Curry's decision not to seek funds with which to employ a psychologist to testify generally about Petitioner's potential future danger to society was not a decision that permeated Petitioner's trial with obvious unfairness.  Defense counsel was not ineffective for failing to seek further psychiatric or psychological assistance from additional experts.

Moreover, Petitioner has failed to establish any prejudice.  While Petitioner mentions in a general manner the available evidence that Petitioner was on drugs when he committed the murders, was taking anti-depressants while awaiting trial, has diabetes, and evidently has a learning disability (although is not mentally retarded), he has failed to show that, had a mental health expert testified about these matters, there is a reasonable probability that he would not have been sentenced to death. In that regard, by way of Petitioner's confession, the jury was already aware that Petitioner claimed to be on heavy intravenous drugs when he murdered all five women and therefore did not remember much of the particulars of the crimes. (State's Trial Ex. #134, 136).  While this Court has before it the records from Petitioner's two stays in a state hospital for substance abuse in 1985, Petitioner has not shown that, had the records of these admissions, which occurred after he killed his first three victims, but before he killed his last two, been admitted into trial, there is a reasonable probability that the result of the trial would have been different.  Because Petitioner has failed to establish either prong of the *Strickland* standard, this ground is without merit. The state habeas court's conclusions did not result in a decision contrary to federal law, and it is recommended that this claim be denied.

### 2.     Voir Dire

In his fifth and sixth claims for relief, Petitioner contends that his trial attorney was ineffective in his representation during the voir dire process.  In particular, Petitioner asserts in his fifth ground for relief that Mr. Curry continuously focused on the prosecution's case and mentioned

mitigating evidence that was not presented at trial, and therefore did not subject the State's case against Petitioner to adversarial testing. In his sixth ground for relief, Petitioner asserts that his trial counsel provided ineffective assistance of counsel by repeatedly raising the issue of parole by admonishing the potential jurors that they were not to consider the issue of parole, rather than discussing with the jurors their views on parole and educating them about parole laws.

With regard to Petitioner's fifth ground for relief, the state habeas court found that, in each of six examples cited to by Petitioner in his state habeas application, trial counsel questioned the potential jurors on the possibility that an incarcerated individual would not be a threat to society and asked the jurors about their ability to require the State to meet its burden of proof beyond a reasonable doubt on the punishment special issues. (SHTr.:146-47, #71-2). The court further found that Petitioner had taken certain statements made by counsel during the questioning of these jurors out of context and concluded that, when the voir dire was viewed in its entirety, trial court did not emphasize the State's case to the detriment of Petitioner's case. (SHTr.:146-47, #67, 73). The court further concluded that discussing aspects of the State's case is a legitimate means to uncover biases and prejudices held by jurors, and that Petitioner had failed to show both that any perceived inadequacies on counsel's part prevented him from ascertaining potential biases or resulted in jurors who were less than fair and impartial. Accordingly, the trial court concluded that Petitioner had failed to show any reasonable probability that he would not have received the death penalty had counsel conducted voir dire as suggested by Petitioner. (SHTr.:158-59, #36-38).

The state habeas court's findings are not an unreasonable determination of the facts in light of the evidence presented, and the conclusions are not an unreasonable application of the *Strickland* standard. In his federal habeas petition, Petitioner points to the defense questioning of three

54

potential jurors as evidence that his trial counsel emphasized the State's case to his detriment. Of these three potential jurors, only one, Terrance Engelke, sat on the jury. Patti Jo Goff was peremptorily struck by the State, and the parties sat a complete jury before reaching Shaun Copeland. Accordingly, with regard to Petitioner's complaints about the voir dire of Goff and Copeland, Petitioner cannot show any reasonable probability that the questioning of these potential jurors resulted in him receiving the death penalty.

With regard to the questioning of Juror Engelke, Petitioner complains that Curry both emphasized the State's case by stating that, with regard to the future dangerousness special issue, the jurors would hear "first and foremost" about crimes a person has committed, and Curry told Engelke about evidence that was then not presented to the jury, such as good things Petitioner had done, factors that led him to the criminal conduct, and the testimony of experts. A review of the questioning of Engelke in its entirety, however, reveals that, rather than emphasizing the State's case or promising to present certain evidence at trial, as with Goff and Copeland, Curry simply stated examples of the "wide variety" of evidence a juror might hear at trial that the parties would use to try to either establish or disprove that a defendant would be a future danger to society. (R. 19:174). Some of this evidence, such as the good things Petitioner had done, was presented to the jury. Other evidence, such as expert testimony from either side, was not. But, after reciting the different types of evidence Ms. Engelke might hear regarding the future dangerousness special issue, Curry asked Engelke if she could conceive of a situation where a particular defendant might be a danger in free society but would not be a danger in the controlled, structured environment of a penitentiary, and she stated that she could. (R. 19:175). Curry was not ineffective in informing Engelke of the possible types of evidence she might hear in order to ascertain whether she could envision a case

where she would decide that someone would not be a future danger if sentenced to life in prison. Furthermore, while Petitioner faults Curry for using the phrase "first and foremost" when describing evidence of prior crimes, this phrase was a correct one, as the State presented Petitioner's guilt in the violent murders of five women as its "first and foremost" evidence that Petitioner would be a future danger to society.[18]  Petitioner's fifth ground for relief is without merit.[19]

With regard to Petitioner's sixth ground for relief, the state habeas court found that trial counsel was confronted with the issue of parole because evidence that Petitioner was previously released on parole was before the jury.  The court further found that references trial counsel made to parole to potential jurors were efforts by counsel to ascertain whether they could disregard the issue of parole in deciding punishment issues.  The court then concluded that such questioning was

---

[18]  Petitioner also criticizes Curry for not presenting certain types of evidence at trial, and therefore discussing this evidence during voir dire, but this Court has already addressed Petitioner's claims that counsel was ineffective for presenting additional mitigating evidence at trial.

[19]  Petitioner also complains that Curry had an "utter failure to recognize even one objectionable juror" based on a tendency to favor the death penalty, an inability to ignore the issue of parole, or an inability to consider mitigation evidence.  While this is not the claim presented to this Court, it should be noted that this sub-claim is not supported by the record.  First, defense did challenge for cause three jurors, and these challenges were sustained by the court. (R. 9:53-54; R. 18:69-70, 132).  Moreover, the parties agreed to excuse numerous potential jurors by agreement, including one of the jurors Petitioner cites to, presumably because these jurors were objectionable to one of the parties either based on their initial questionnaires or after questioning. (R. 12:92-133, 171-72; R. 13:126-28; R. 14:211-13; R. 15:179-81; R. 16:130-33; R. 17:210-12; R. 20:217-21; R. 21:42-50; R. 22:99-100).
Moreover, with regard to the potential jurors that Petitioner cites to as "objectionable" jurors to the defense, only one sat on the jury.  Five were peremptorily struck by the defense (R. 15: 40-44, 173; R. 20:35; R. 21:57, 85; R. 23:12, 13, 16, 19, 20), indicating that they were objectionable in some way to the defense; two were struck by the State (R. 16:124-26; R. 20:208; R. 23: 13, 17); and one was excused by agreement (R. 12:124-26, 171-72).  And Dickie Dodd, who did sit on the jury, stated during questioning that he believed that, according to what is reported in the media, punishments do not seem to fit the crimes, either because they are too severe or not severe enough. (R. 21:125).  Contrary to Petitioner's assertion, this statement did not reveal that he strongly favored the death penalty.
Finally, to the extent that Petitioner is asserting that defense counsel should have attempted to challenge these jurors for cause, rather than use peremptory strikes, the record before this Court does not support a claim that any of these jurors were challengeable for cause because none of them stated that they would be unable to follow the law.

not only proper, but prudent, as relevant state case law holds that jurors who cannot disregard parole as an issue are subject to challenges for cause. (SHTr.:149-50, 161 #90-94, #53-4). The habeas court further concluded that Petitioner had failed to establish a reasonable probability that Petitioner would not have received the death penalty had voir dire been conducted differently. (SHTr.:161, #56).

Again, these factual findings are not an unreasonable determination of the facts in light of the evidence presented, and these conclusions are not an unreasonable application of the *Strickland* standard. The jurors in Petitioner's case were instructed by the trial court that they were not to discuss or consider the issue of parole in any way, including how long Petitioner would be required to serve if sentenced to life imprisonment, during their deliberations. (Tr.:163). This instruction was acceptable pursuant to state law as it existed at the time of Petitioner's trial, and indeed the Texas Court of Criminal Appeals had previously held that parole was not a proper consideration for the juries in death penalty trials. *Lawton v. State*, 913 S.W.2d 542 (1995), *McGinn v. State*, 961 S.W.2d 161 (Tex. Crim. App. 1998).[20] Moreover, while Petitioner argues that the jury would have been more likely to sentence him to life imprisonment if the jury had known about his parole eligibility, Petitioner states the law incorrectly when he states that he would not have been eligible for parole for forty years. (Petition at 68). The Texas legislature did not begin increasing the amount of time sometime sentenced to life imprisonment had to serve before being eligible for parole until 1991,

---

[20] As noted earlier, under subsequent state law, in cases in which the murder was committed on or after September 1, 1999, defense attorneys could, if they so chose, opt for capital juries to be instructed that a capital murder defendant sentenced to a life sentence would not be eligible for parole for forty years. TEX. CODE CRIM PROC. ANN. Art. 37.071, § 2(e)(2) (Vernon 1999). As of September 1, 2005, parole is no longer an option for a defendant convicted of capital murder. The only two sentencing options that remain are death or life without parole. TEX. CODE CRIM PROC. ANN. Art. 37.071 § 2(g) (Vernon 2005).

when the legislature raised the minimum time to thirty-five years. This change in the law, however, was for crimes committed on or after September 1, 1991. Because Petitioner committed his five murders in 1984, 1985, and 1986, he would, under the law as it existed then, have been eligible for parole in twenty years. *See Ex parte Chance*, 828 S.W.2d 5, 7 (Tex. Crim. App. 1992); Act of Sept. 1, 1991, 72nd Leg., R.S., ch. 652, § 10, 15(b) (amended 1999). Because of Petitioner's relative youth, defense counsel would have had good reason to want to conceal from the jury Petitioner's parole eligibility, rather than specifically instruct them on the issue.

By questioning the jurors on the issue of parole, Curry was attempting to educate potential jurors on the law and insure that these potential jurors would be able to ignore the issue of parole after the trial began. Given that defense counsel knew that the State would place into evidence Petitioner's prior conviction for the murder of Tina Kimbrew, and therefore the jury would be made aware that Petitioner was paroled in that case, counsel was not ineffective for attempting to insure that the jury that sat in Petitioner's trial would be able to ignore the issue of parole. Petitioner's sixth ground for relief is also without merit, and it is recommended that both grounds be denied.

### 3.    Closing Statement

In his seventh ground for relief, Petitioner asserts that his trial attorney was ineffective because he gave only a "perfunctory" closing statement at the punishment phase of the trial. In particular, Petitioner faults counsel for making a "disjointed presentation" during his closing statement and asserts that counsel both failed to make an emotional plea for mercy and failed to make an argument based on the law.[21]

---

[21]

Petitioner also appears to make a cursory statement that his trial attorney was ineffective for failing to present an opening statement but provides little argument to support this claim and does not include this apparent claim as a separate ground for relief. (*See* Petition at 70-1). This Court will therefore not address

Petitioner contends that, had counsel developed further evidence to be presented at the punishment phase of the trial, he could have argued effectively that Petitioner would not be a future danger in prison based on his prior prison record and could have also argued that evidence of Petitioner's prior drug abuse, his learning impairment and prior education, his religious conversion, and his rehabilitation mitigated against the imposition of the death penalty, even if he would constitute a future danger to society.

In his closing statement at the punishment phase of the trial, John Curry first acknowledged that there had been a lot of pain and heartbreak that was heard during the trial and that, while it was difficult not to have a strong emotional reaction after hearing about the murders, he hoped that the jurors would, rather than acting on anger, follow the law and review the evidence when answering the special issues. (R. 28:18-9). Curry then stated that, while it might be helpful to know what combination of factors in Petitioner's life led to the murders, he did not believe that they would ever know or that it mattered to the jury because what the jury was concerned with was the appropriate punishment that would be in the best interests of society. Curry pointed out that Petitioner pled guilty not only to the murder of Terry Sims but that, when he was questioned by the authorities, he told them that he was not only guilty of the four murders that the authorities knew about, but also confessed to the murder of Debra Taylor, about whom they were unaware. Thus, Curry argued that, while he would not argue that Petitioner was a changed man, he did believe that Petitioner's religious faith and his desire to assume responsibility were behind Petitioner's decision to confess to all of the murders and plead guilty. (R. 28:20-21).

---

it.

Curry then argued that Petitioner would not be a continuing threat to society because he would be in prison and he had shown that he could conform himself to both the regimented system in prison, without any major infractions in eleven years, and to the electronic monitoring and other requirements that he had to follow while on parole. (R. 28:21-22). Curry pointed to the testimony given by Petitioner's parole officer, who stated that Petitioner was one of the best parolees that he supervised. Curry concluded his closing statement by stating that there was evidence that Petitioner would not be a future danger in the prison setting, that he would die when God takes him, that he believed that Petitioner knew when he confessed that he was placing his fate in the hands of twelve people, and that the guidance he could give the jurors was to do nothing that would harm their consciences. (R. 28:22-23).

In considering whether a closing statement constituted ineffective assistance of counsel, an appellate court should look at the closing statements in their entirety. *Carter v. Johnson*, 131 F.3d 452, 466 (5th Cir. 1997). And counsel is not ineffective for making the strategic decision to acknowledge a defendant's culpability and even concede that the death penalty would be justified in order to establish credibility with the jury. *Id.*

The state habeas court found that trial counsel made the strategic decision not to present evidence that Petitioner had changed or rehabilitated himself in prison and opting instead to rely upon the State's evidence of his disciplinary history in prison to illustrate that he would not be a future danger. Accordingly, the habeas court found, it would have been an impermissible jury argument if counsel had argued outside the record regarding testimony that was not before the jury. (SHTr.:150-52, #96-104). The state habeas court then concluded that trial counsel was not ineffective with respect to his closing argument because the argument was based upon the defense

thought to be most advantageous to Petitioner, and the argument effectively emphasized this defensive theory that Petitioner would not be a future danger if incarcerated. The state habeas court further concluded that Petitioner had failed to establish a reasonable probability that Petitioner would not have received the death penalty had the closing argument been different. (SHTr.:153, 161-62, #107, 62-63, 66-67).

The state habeas court's conclusions are not an unreasonable application of the *Strickland* standard. According to the record of the trial, after closing arguments concluded, the jury deliberated from 9:10 a.m. until 12:20 p.m., and again from 2:00 to 2:25 p.m. before reaching a verdict. The record reflects that the jury also sent out two notes that morning, one of which asked the judge to define whether the term "society" meant public or prison. (R. 28:36-8).[22] The length of the deliberations and the fact that the jury sent two questions for the judge to answer is evidence that the jury seriously deliberated its options before reaching its verdict. This is evidence that supports a conclusion that defense counsel's closing argument did not constitute ineffective assistance of counsel.

---

[22] The record does not reflect what the second note said, but does reflect that, in reply to the first note, the trial court wrote back that: "Members of the jury, there is no specific definition for the terms that you referenced in your note which was received at 10:48 a.m." In response to the second note, received at 11:27 a.m., at the request of the State, the jury was brought back to the courtroom and the following instruction read to them:

> Members of the jury, while the law does not permit me to answer your specific question, you are instructed that words and phrases used in the charge that have special legal definitions are, in fact, defined for you. All other words and phrases such as that contained in your note are to be given the meaning commonly understood.

(R. 28:36-39).

While Petitioner argues that these notes are evidence that Curry should have informed the jurors that Petitioner would not be eligible for parole for forty years, the jury instructions make clear that this would have been an impermissible argument, as the trial court instructed the jurors that: "[d]uring your deliberations, you are not to consider or discuss any possible actions the Board of Pardons and Paroles or the Governor nor how long this defendant will be required to serve on a sentence of life imprisonment." (Tr.:163). Moreover, as noted earlier, in actuality Petitioner would have been eligible for parole in twenty years. Accordingly, trial counsel cannot be considered ineffective for failing to argue the issue of parole to the jury. Moreover, while Petitioner also contends that counsel was ineffective for failing to present evidence that Petitioner was a productive member of society both in prison and while on parole, of his prior drug abuse and the fact that he no longer used drugs or alcohol, his sincere religious conversion, and the fact that Petitioner suffers from diabetes and therefore has a shorter life expectancy, as noted earlier, trial counsel was aware of most, if not all, of this evidence and made the strategic decision not to present this evidence at trial. Having previously concluded that this decision was not ineffective assistance of counsel, this Court declines to find that a failure to argue evidence not in the record during summation was ineffective assistance of counsel, either.

In summary, trial counsel made a summation based on his defensive strategy of arguing that Petitioner would not be a future danger while imprisoned for the rest of his life, as evidenced by the lack of disciplinary actions while he was imprisoned previously for one of the murders and his ability to conform to the harsh regimen of parole. The record before this Court indicates that the jury carefully deliberated Petitioner's fate for several hours before sentencing him to death. Trial

counsel was not ineffective in the presentation of the closing statement. This ground is without merit, and it is recommended that it be denied.

**B.      Cumulative Error Claim**

In his eighth ground for relief, Petitioner asserts that he is entitled to habeas relief based on the cumulative effect of all the constitutional violations alleged in his petition. Specifically, Petitioner asserts that the cumulative effect of the ineffective assistance of counsel claims he has made undermines confidence in the jury's punishment verdict.

In *Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992), the Fifth Circuit held that in order for a federal habeas petitioner to prevail on a claim of cumulative error at a state trial, he must establish that: 1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; 2) the errors were not procedurally defaulted for habeas purposes; and 3) the constitutional errors so infected the entire trial that the resulting conviction violates due process. *Id.* at 1458.

Because this Court has previously determined that Petitioner is entitled to relief based on one of his claims of ineffective assistance of counsel, it is unnecessary for this Court to address this ground for relief.

## <u>RECOMMENDATION</u>

This Court recommends that Petitioner's habeas petition with respect to his death sentence be GRANTED. This Court further recommends that Petitioner's sentence of death be VACATED and that Respondent be ordered to re-sentence Petitioner within 180 days.

Signed this 25th day of July, 2008.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

# INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

The United States District Clerk shall serve a true copy of these findings, conclusions and recommendation on the parties. Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must serve and file written objections within ten days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150, 106 S. Ct. 466, 472 (1985). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE